STATE STREET BANK AND TRUST COMPANY *vs.* MURRAY
P. REISER, trustee, & another.[1]

Suffolk.    March 16,1979. — May 23, 1979.

Present: ARMSTRONG, PERRETTA, & KASS. JJ.

*Trust,* Revocable trust, Claim of creditor.

Where a person places property in trust and reserves the right to
amend and revoke, or to direct disposition of principal and income,
the settlor's creditors may, following the death of the settlor, reach
in satisfaction of the settlor's debts to them, to the extent not satis-
fied by the settlor's estate, those assets owned by the trust over
which the settlor had such control at the time of his death as would
have enabled the settlor to use the trust assets for his own benefit.
[636-639]

CIVIL ACTION commenced in the Probate Court for the
county of Suffolk on July 31, 1975.

The case was heard by *Yasi, J.*

*William F. Macauley* for the plaintiff.

*James R. DeGiacomo (Judith K. Wyman* with him) for
the defendants.

KASS, J. State Street Bank and Trust Company (the
bank) seeks to reach the assets of an inter vivos trust in
order to pay a debt to the bank owed by the estate of the
settlor of the trust. We conclude that the bank can do so.

The probate judge found the material facts, and, al-
though the evidence is reported, we accept his findings if
not clearly erroneous. *Kaplan* v. *School Comm. of Mel-
rose,* 363 Mass. 332, 335 (1973). *Olsson* v. *Waite,* 373 Mass.
517, 520 (1977). We summarize those findings.

Wilfred A. Dunnebier created an inter vivos trust on
September 30, 1971, with power to amend or revoke the

---

[1] Theodore A. Ranieri, successor trustee.

trust and the right during his lifetime to direct the disposition of principal and income. He conveyed to the trust the capital stock of five closely held corporations. Immediately following execution of this trust, Dunnebier executed a will under which he left his residuary estate to the trust he had established.

About thirteen months later Dunnebier applied to the bank for a $75,000 working capital loan. A bank officer met with Dunnebier, examined a financial statement furnished by him and visited several single family home subdivisions which Dunnebier, or corporations he controlled, had built or were in the process of building. During their conversations, Dunnebier told the bank officer that he had controlling interests in the corporations which owned the most significant assets appearing on the financial statement. On the basis of what he saw of Dunnebier's work, recommendations from another bank, Dunnebier's borrowing history with the bank, and the general cut of Dunnebier's jib, the bank officer decided to make an unsecured loan to Dunnebier for the $75,000 he had asked for. To evidence this loan, Dunnebier, on November 1, 1972, signed a personal demand note to the order of the bank. The probate judge found that Dunnebier did not intend to defraud the bank or misrepresent his financial position by failing to call attention to the fact that he had placed the stock of his corporations in the trust.

Approximately four months after he borrowed this money Dunnebier died in an accident. His estate has insufficient assets to pay the entire indebtedness due the bank.

Under Article Fourteen of his inter vivos trust, Dunnebier's trustees "may in their sole discretion pay from the principal and income of this Trust Estate any and all debts and expenses of administration of the Settlor's estate." The bank urges that, since the inter vivos trust was part of an estate plan in which the simultaneously executed will was an integrated document, the instruction

in Dunnebier's will that his executor pay his debts[2] should be read into the trust instrument. This must have been Dunnebier's intent, goes the argument.

Leaving to one side whether the precatory language in the will could be read as mandatory, and whether the language of that separate, albeit related, instrument, constitutes a surrounding circumstance (see *Hull* v. *Adams*, 286 Mass. 329, 333 [1934]; *Dumaine* v. *Dumaine*, 301 Mass. 214, 218 [1938]) which could guide us in interpreting the trust,[3] we find the trust agreement manifests no such intent by Dunnebier. Article Fourteen speaks of the sole discretion of the trustees. Subparagraphs A and B of Article Five, by contrast, direct the trustees unconditionally to pay two $15,000 legacies provided for in Dunnebier's will if his estate has insufficient funds to do so. It is apparent that when Dunnebier wanted his trustees unqualifiedly to discharge his estate's obligations, he knew how to direct them. As to those matters which Dunnebier, as settlor, left to the sole discretion of his trustees, we are not free to substitute our judgment for theirs as to what is wise or most to our taste. The court will substitute its discretion only on those relatively rare occasions when it is necessary to prevent an abuse of discretion. *Sylvester* v. *Newton*, 321 Mass. 416, 421-422 (1947). *Nexon* v. *Boston Safe Deposit & Trust Co.*, 5 Mass. App. Ct. 493, 495-496 (1977). Restatement (Second) of Trusts § 187 (1959) (see particularly comment [j], which says that where such adjectives as "absolute" or "unlimited" or "uncontrolled" modify the word "discretion" the trustees may act unreasonably, so long as not dishonestly or from a motive other than the accomplishment of the purposes of the trust). Here, the trustees could have considered

---

[2] "It is my wish that all my just debts . . . be fully paid."

[3] As was said in *First Natl. Bank* v. *Shawmut Bank*, 378 Mass. 137, 143 (1979), "In today's estate planning, it is not reasonable to conclude that a will is always of greater significance than an instrument creating an inter vivos trust."

preservation of the trust corpus for the benefit of the beneficiaries as most consistent with the trust purpose.

During the lifetime of the settlor, to be sure, the bank would have had access to the assets of the trust. When a person creates for his own benefit a trust for support or a discretionary trust, his creditors can reach the maximum amount which the trustee, under the terms of the trust, could pay to him or apply for his benefit. *Ware* v. *Gulda*, 331 Mass. 68, 70 (1954). Restatement (Second) of Trusts § 156(2) (1959). This is so even if the trust contains spendthrift provisions. *Pacific Natl. Bank* v. *Windram*, 133 Mass. 175, 176-177 (1882). *Merchants Natl. Bank* v. *Morrissey*, 329 Mass. 601, 605 (1953). Restatement (Second) of Trusts § 156(1) (1959). Under the terms of Dunnebier's trust, all the income and principal were at his disposal while he lived.

We then face the question whether Dunnebier's death broke the vital chain. His powers to amend or revoke the trust, or to direct payments from it, obviously died with him, and the remainder interests of the beneficiaries of the trust became vested. The contingencies which might defeat those remainder interests could no longer occur. *Greenwich Trust Co.* v. *Tyson*, 129 Conn. 211, 225 (1942). In one jurisdiction, at least, it has been held that when the settlor of a revocable living trust dies, the property is no longer subject to his debts. *Schofield* v. *Cleveland Trust Co.*, 135 Ohio St. 328, 334 (1939). See generally McGovern, The Payable on Death Account and Other Will Substitutes, 67 Nw. L. Rev. 7, 26-29 (1972). Cf. Griswold, Spendthrift Trusts § 475 (2d ed. 1947).

Traditionally the courts of this Commonwealth have always given full effect to inter vivos trusts, notwithstanding retention of powers to amend and revoke during life, even though this resulted in disinheritance of a spouse or children and nullified the policy which allows a spouse to waive the will and claim a statutory share, G. L. c. 191, § 15. See *National Shawmut Bank* v. *Joy*, 315 Mass. 457, 474-475 (1944); *Kerwin* v. *Donaghy*, 317 Mass.

559, 567 (1945); *Ascher* v. *Cohen*, 333 Mass. 397, 400 (1956). It might then be argued that a creditor ought to stand in no better position where, as here, the trust device was not employed in fraud of creditors.

There has developed, however, another thread of decisions which takes cognizance of, and gives effect to, the power which a person exercises in life over property. When a person has a general power of appointment, exercisable by will or by deed, and exercises that power, any property so appointed is, in equity, considered part of his assets and becomes available to his creditors in preference to the claims of his voluntary appointees or legatees. *Clapp* v. *Ingraham*, 126 Mass. 200, 202 (1879). *Shattuck* v. *Burrage*, 229 Mass. 448, 452 (1918). *State St. Trust Co.* v. *Kissel*, 302 Mass. 328, 333 (1939). Compare *Prescott* v. *Wordell*, 319 Mass. 118, 120 (1946). These decisions rest on the theory that as to property which a person could appoint to himself or his executors, the property could have been devoted to the payment of debts and, therefore, creditors have an equitable right to reach that property. It taxes the imagination to invent reasons why the same analysis and policy should not apply to trust property over which the settlor retains dominion at least as great as a power of appointment. The Restatement of Property has, in fact, translated the doctrine applicable to powers of appointment to trusts: "When a person transfers property in trust for himself for life and reserves a general power to appoint the remainder and creates no other beneficial interests which he cannot destroy by exercising the power, the property, though the power is unexercised, can be subjected to the payment of the claims of creditors of such person and claims against his estate to whatever extent other available property is insufficient for that purpose." Restatement of Property § 328 (1940). See also, for the assimilation of a power to revoke to a general power of appointment, concurring opinion of Goodman, J., in *Massachusetts Co.* v. *Berger*, 1 Mass. App. Ct. 624, 628 n.3 (1973).

As an estate planning vehicle, the inter vivos trust has become common currency. See *Second Bank-State St. Trust Co.* v. *Pinion*, 341 Mass. 366, 371 (1960). Frequently, as Dunnebier did in the instant case, the settlor retains all the substantial incidents of ownership because access to the trust property is necessary or desirable as a matter of sound financial planning. Psychologically, the settlor thinks of the trust property as "his," as Dunnebier did when he took the bank's officer to visit the real estate owned by the corporation whose stock he had put in trust. See *Fiduciary Trust Co.* v. *First Natl. Bank*, 344 Mass. 1, 9 (1962). In other circumstances, persons place property in trust in order to obtain expert management of their assets, while retaining the power to invade principal and to amend and revoke the trust. It is excessive obeisance to the form in which property is held to prevent creditors from reaching property placed in trust under such terms. See Restatement of Property § 328, Comment a (1940).

This view was adopted in *United States* v. *Ritter*, 558 F.2d 1165, 1167 (4th Cir. 1977). In a concurring opinion in that case Judge Widener observed that it violates public policy for an individual to have an estate to live on, but not an estate to pay his debts with. *Id.* at 1168. The Internal Revenue Code institutionalizes the concept that a settlor of a trust who retains administrative powers, power to revoke or power to control beneficial enjoyment "owns" that trust property and provides that it shall be included in the settlor's personal estate. I.R.C. §§ 2038 and 2041.

We hold, therefore, that where a person places property in trust and reserves the right to amend and revoke, or to direct disposition of principal and income, the settlor's creditors may, following the death of the settlor, reach in satisfaction of the settlor's debts to them, to the extent not satisfied by the settlor's estate, those assets owned by the trust over which the settlor had such control at the time of his death as would have enabled the settlor to use the trust assets for his own benefit. Assets

which pour over into such a trust as a consequence of the settlor's death or after the settlor's death, over which the settlor did not have control during his life, are not subject to the reach of creditors since, as to those assets, the equitable principles do not apply which place assets subject to creditors' disposal.

The judgment is reversed, and a new judgment is to enter declaring that the assets owned by the trust (Wilfred A. Dunnebier Trust, I) up to the time of Dunnebier's death can be reached and applied in satisfaction of a judgment entered in favor of the plaintiff against the estate of Dunnebier, to the extent assets of the estate are insufficient to satisfy such a judgment.

*So ordered.*