**Paul F. MARKHAM, as he is Trustee for the Bankruptcy Estate of Louis Almeida, Plaintiff,**

v.

**Claire M. FAY, Individually and as Trustee of the Highland Avenue Nursing Home Trust, the Parker Hill Nursing Home Trust, and the Green Pastures Nursing Home Trust, Regina Nursing Home, Inc., the United States of America, Richard H. Gens, Joseph Wine, P.C., Defendants.**

Civ. A. No. 91–10821–RWZ.

United States District Court, D. Massachusetts.

March 22, 1995.

Patrick P. Dinardo, Sullivan & Worcester, Boston, MA, for Paul F. Markham.

Deborah A. Beard, Boston, MA, for Claire M. Fay, Regina Nursing Home, Inc.

George P. Eliopoulos, U.S. Dept. of Justice, Tax Div., Washington, DC, Susan M. Poswistilo, U.S. Atty's Office, Boston, MA, for U.S.

William E. Gens, Boston, MA, for Richard H. Gens.

### OPINION

COLLINGS, United States Magistrate Judge.

## I.  INTRODUCTION

This is an interpleader action arising out of the bankruptcy case *In Re: Louis Almeida,* No. 78–1684–L in the District of Massachusetts.  The trustee in bankruptcy of the debtor has interpled a fund of $67,809.89 representing the proceeds from the sale of nursing homes held in the name of Almeida upon which the defendants Regina Nursing Home, Inc. (hereafter "the corporate defendant" or "Regina"), the Highland Avenue Nursing Home Trust (hereinafter "Highland Avenue"), the Parker Hill Nursing Home Trust (hereinafter "Parker Hill") and the Green Pastures Nursing Home Trust (hereinafter "Green Pastures") retained mortgages.  Earlier in this litigation, the rights to a portion of that amount, i.e., $16,970.00, were determined as a matter of law on the basis of summary judgment.  (# 89)

The United States is asserting an interest in the balance of the fund, i.e., $50,839.89 plus interest, as the holder of a judgment in the amount of $699,142.21 rendered against the defendant Claire M. Fay (hereinafter "Fay") individually on December 30, 1990. That judgment was premised upon federal tax assessments made against Fay under 26 U.S.C. §§ 6671 and 6672 for her willful failure as a responsible person to collect, truthfully account for and pay over to the United States, the income and F.I.C.A. taxes withheld from the wages of employees of various nursing homes held in the name of Louis Almeida.  The United States takes the position that its federal tax liens against Fay attached "upon all property and rights to property, whether real or personal, belonging to" her pursuant to 26 U.S.C. § 6321.

To digress momentarily for contextual purposes, Fay was the president, treasurer and sole stockholder of the corporate defendant (at least for a period of time), and was also the settlor, trustee and a beneficiary of each of the defendant trusts.  The principal asset of the defendant corporation[1] and trusts were nursing homes which, in 1976, Fay caused to be transferred to Louis Almeida. Fay, on behalf of the defendant corporation and trusts, took back mortgages on the properties from Almeida.  These are the nursing homes that were ultimately sold by the trustee in bankruptcy and the source of the interpled fund.

The basis for the government's claim in the instant case is twofold.  First it is alleged that Fay retained such significant powers under the terms of the three defendant trusts to use the trust assets for her own benefit that the United States, as a creditor of Fay, can reach the assets of the defendant trusts, i.e., the interpled fund, to satisfy Fay's federal tax liabilities established by the judgment and secured by the federal tax liens against Fay.  Second, the United States contends that the corporate and trust defendants are alter egos, instrumentalities or nominees of Fay such that their assets are in fact Fay's assets and, therefore, subject to the federal tax liens that arose pursuant to 26 U.S.C. § 6321.

A three day non-jury trial was held during

---

1.  The corporate defendant in fact owned three other properties in addition to the Chester Manor  Nursing Home.

November of 1993.[2] Following the receipt of the trial transcripts, the parties filed proposed findings of fact and conclusions of law (## 115, 117) as well as posttrial briefs (# 116, 118, 119). After due consideration of the evidence and the parties' submissions, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52(a), Fed.R.Civ.P.

## II. FINDINGS OF FACT

1. During the 1960's and 1970's, defendant Fay created numerous legal entities for the purpose of owning and operating nursing homes in Massachusetts. (TR2–155–158)

2. In late July or early August of 1967, Fay became the sole stockholder of the corporate defendant. At the same time, Fay named herself President and Treasurer of the corporation. In addition, Fay was a director of Regina along with Blanche L. Minville and Maxime A. Minville, her parents. The clerk of the corporation was John B. Delaney. At some point in time, but at least by June 15, 1973, Mr. Minville no longer served as a director, and Theresa Dzialo (hereinafter "Dzialo"), Fay's sister, was named in his stead. (TR2–157–158; Exh. 4A, 4B)

3. The corporation defendant owned and operated the Chester Manor Nursing Home (hereinafter "Chester Manor") located at 10 Chester Street in Cambridge, Massachusetts. Subsequent to the summer of 1967, Regina also acquired at least three other parcels of real estate in Cambridge, Massachusetts. (TR2–158; Exh. 4A, 4B, 4I, 4J, 4K)

4. Fay contends that in the late 1970's she "assigned" all of her stock in the corporate defendant to Dzialo as security for monies that her sister had lent her. According to an affidavit signed by Theresa Dzialo on July 22, 1992, Dzialo assumed Fay's individual debts in return for which Fay "exchanged" all of her corporate stock with Dzialo. Fay denies owning the corporate defendant; Dzialo claims to own all of the stock. There has been no documentation produced evidencing this "assignment" or "exchange." (TR2–158–160; TR3–3–4; Exh. 19 at pp. 20, 23, Exh. 42)

5. On or about June 21, 1976, Fay, as Treasurer and President of the corporate defendant, conveyed the property located at 10 Chester Street, as well as Chester Manor, to Louis Almeida (hereinafter "Almeida") as trustee of the Chester Manor Nursing Home Trust which was created on June 18, 1976, for $10,000.00. On or about September 8, 1976, pursuant to an amended agreement, a confirmatory deed was recorded reflecting that the purchase price for the property was increased to $275,000.00. According to the terms of the amended agreement, Almeida was to pay the corporate defendant $10,000.00 in cash, assume an existing mortgage in the amount of $6,500.00, and execute notes and mortgages in favor of Regina for the balance of the purchase price. (Exh. 4C, 4D, 4E, 4F, 4G, 4H)

6. On or about September 22, 1978, Fay, as Treasurer and President of the corporate defendant, transferred the property at 16 Chester Street to James Daniel Fay, as trustee of the James Daniel Realty Trust, for no consideration. James Daniel Fay is Fay's son; the James Daniel Realty Trust was created on September 18, 1978. (TR3–7–9; 3–27–28; Exh. 4I)

7. On or about October 6, 1978, Fay, as Treasurer and President of the corporation defendant, transferred two additional parcels of real estate located in Cambridge, Massachusetts, to James Daniel Fay, as trustee of the James Daniel Realty Trust, again for no consideration. (TR3–7; 3–28; Exh. 4J, 4K)

8. On or about July 16, 1980, Blanche L. Minville as trustee of the James Daniel Realty Trust, transferred the property located at 16 Chester Street to Edward Paul Silva, as trustee of the C. and E. Realty Trust, for no consideration. Edward Paul Silva was an acquaintance of Fay for more than twenty years; the C. and E. Realty Trust was created on July 14, 1980. (TR3–12; 3–14; Exh. 4K)

---

**2.** This case has been referred to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

9. On or about March 5, 1981, Edward Paul Silva as trustee of the C. and E. Realty Trust transferred the property located at 16 Chester Street to Edward Paul Silva, as trustee of the T.J. Realty Trust, for no consideration. The abbreviation "T.J." stands for Timothy James, one of Fay's sons; the T.J. Realty Trust was created on February 28, 1981. (TR3-13-15; Exh. 4L)

10. On or about September 23, 1982, Edward Paul Silva, as trustee of the T.J. Realty Trust transferred the property located at 16 Chester Street to Richard E. Lenza, as trustee of the CHE Trust, for $130,000.00. Richard E. Lenza is an attorney and an acquaintance of Fay; the CHE Trust was created on September 20, 1982. (TR3-15-16; Exh. 4N)

11. Property owned by the corporate defendant located at 6 Chester Street, Cambridge, Massachusetts was subject to a similar series of transfers, the final conveyance occurring on or about June 6, 1985 from Edward P. Silva, as trustee of the T.J. Realty Trust to Richard E. Lenza, as trustee of the MCA Trust, which was created on May 1, 1985, for nominal consideration. (TR3-19-20; Exh. 4K, 4L, 4M)

12. On or about February 20, 1992, Fay filed a complaint in the Land Court of the Commonwealth of Massachusetts wherein it was alleged that she individually was the owner in fee simple absolute of, inter alia, the land and buildings situated at 16 Chester Street and 6 Chester Street. Fay demanded judgment that she be entitled to an estate in fee simple absolute in those properties. (TR3-16-21; Exh. 29E)

13. On or about January 21, 1974, Fay, as settlor, created the Green Pastures Nursing Home Trust ("Green Pastures") and named herself as the sole trustee. The beneficiaries of the trust were Fay and her two sons, James Daniel Fay and Timothy James Fay, all in equal shares. Pursuant to the declaration of trust, Fay caused to be transferred to herself as trustee the Green Pastures Nursing Home. (Exh. 1A, 1B)

14. Paragraph 5 of the Green Pastures declaration of trust provided as follows:

> In extension and not in limitation of the powers she will have by law or other provisions of this DECLARATION OF TRUST, the Trustee shall have the following powers and discretions with respect to this Trust and its property, in each case to be exercised from time to time in her sole discretion and without order or license of any Court:—

The Trustee shall have full power to buy, acquire and take title to real estate at any place within the Commonwealth of Massachusetts, whether the same be improved or unimproved property; to hold, manage and improve all real estate at any time subject to this Trust; to carry on and conduct the business of a nursing home and to obtain all licenses and permits in connection therewith; to sell, to exchange, to lease, to improve, to subdivide and resubdivide; to mortgage, to subject to easement, restrictions, conditions and servitudes, and to make contracts of any kind concerning the trust property or any part thereof, which leases and contracts may extend beyond the term of this Trust; to give options therefor; to sign, seal, acknowledge and deliver deeds, mortgages, transfers, leases, releases, partial releases, discharges, assignments, and other instruments of any kind and all on such terms and conditions as the Trustee in her sole discretion shall deem proper; to acquire other lands by purchase or otherwise; to improve the trust property in whatever manner she may deem advisable; to borrow money on the faith and credit of the trust estate on such terms and conditions as she shall see fit and to secure the payment of notes and other obligations with any or all of the trust property; to assign, discharge or foreclose any mortgages at any time held by her and to give partial release or releases therefrom; to represent the beneficiaries in all suits or proceedings in law or in equity or before other bodies or tribunals; to engage legal counsel and other agents and employees, to commence suits or proceedings in any Court or tribunal and to compromise or submit to arbitration all matters of dispute to which the Trust or Trustee may be a party; to invest any money she may have on hand in mortgages, bonds or other securities, or to lend the same with or with-

out security as she may see fit; to own stock and to exercise all the powers appertaining thereto; to determine whether any money or things shall for the purpose of these presents be considered capital or income, and to determine what constitutes the income and the net income for any period or periods of time; to determine whether any expense or outgo shall be borne by capital or by income; to make distribution in cash or in kind or partly in cash and partly in kind; and to do any and all other things necessary or incidental to the accomplishment of this Trust as if such additional powers were herein fully set forth.

(Exh. 1A, ¶ 5)

15. Further, under the terms of the trust Fay, as trustee, "shall have full power and discretion to pay over to said beneficiaries so much or all or any part of the trust property, whether principal or net income, as she shall deem proper"; reserved the right to change the named trustee; and "... reserves to herself the right to alter, amend and revoke this Trust, in whole or in part, and to terminate the same ..." (Exh. 1A, ¶¶ 8, 9 and 10)

16. Upon the termination of the trust for any reason, the trust property and undistributed income were to vest in Fay's sister Dzialo, not in any of the trust beneficiaries. (Exh. 1A, ¶ 12)

17. On or about June 21, 1976 Fay, as trustee of Green Pastures, conveyed the Green Pastures Nursing Home together with the land upon which it was situated to Almeida, as trustee of the Marion Road Nursing Home Trust which was created on June 18, 1976, for $10,000.00. On or about September 8, 1976, pursuant to an amended agreement, a confirmatory deed was recorded reflecting that the purchase price for the property was increased to $410,000.00. According to the terms of the amended agreement, Almeida was to pay Fay, as trustee of Green Pastures, $10,0000.00 in cash, assume outstanding mortgages in the amount of $176,675.13

and execute notes and mortgages in favor of Fay as trustee of Green Pastures for the balance of the purchase price. (Exh. 1C, 1D, 1E, 1F, 1G, 1H)

18. On or about January 21, 1974 Fay, as settlor, created the Parker Hill Nursing Home Trust ("Parker Hill") and named herself as the sole trustee. The beneficiaries of the trust were Fay and her two sons, James Daniel Fay and Timothy James Fay, all in equal shares. Pursuant to the declaration of trust, Fay caused to be transferred to herself as trustee the Parker Hill Nursing Home. (Ex. 2A, 2B)

19. The terms of the declaration of trust establishing Parker Hill are identical to those of the declaration of trust creating Green Pastures with the obvious exception of the name of the trust and the assets held, i.e., the individual nursing homes. (*Compare* Exh. 1A with 2A)

20. On or about June 21, 1976, Fay, as trustee of Parker Hill, conveyed the Parker Hill Nursing Home together with the land upon which it was situated to Almeida as trustee of the Gardner Nursing Home Trust which was created on June 18, 1976, for $20,000.00. On or about September 8, 1976 a confirmatory deed was recorded reflecting that the purchase price for the property was increased to $854,252.00. Fay, as trustee of Parker Hill, took back a mortgage in the amount of $198,826.18 from Almeida as part of this transaction. (Exh. 2C, 2D)

21. On or about August 14, 1974, Fay, as settlor, created the Highland Avenue Nursing Home Trust ("Highland Avenue") and named herself as the sole trustee. The beneficiaries of the trust were Fay, her sister Dzialo and her two sons James Daniel Fay and Timothy James Fay, in equal shares. On or about August 30, 1974, Fay as trustee of Highland Avenue purchased the Highland Avenue Nursing Home. (Exh. 3A, 3B)

22. Fay's powers as trustee are set forth in the declaration of trust. (Exh. 3A)[3]

---

**3.** Resolving the question as to whether the assets of Highland Avenue can be considered Fay's personal property for purposes of satisfying her debt to the United States requires a rather extended discussion of the terms of the declaration of trust. Accordingly, the relevant terms of the declaration which bear on Fay's powers as trustee are discussed in part III.B.2. of this Opinion, *infra*, at pp. 607–610.

23. On or about June 21, 1976, Fay, as trustee of Highland Avenue, conveyed the Highland Avenue Nursing Home together with the land upon which it was situated to Almeida, as trustee of the Highland Nursing Home Trust which was created on June 18, 1976, for $10,000.00. On or about September 8, 1976, pursuant to an amended agreement, a confirmatory deed was recorded reflecting that the purchase price for the property was increased to $220,000.00. According to the terms of the amended agreement, Almeida was to pay Fay, as trustee of Highland Avenue, $10,000.00 in cash, assume outstanding mortgages in the amount of $87,650.81 and execute notes and mortgages in favor of Fay as trustee of Highland Avenue for the balance of the purchase price. (Exh. 3C, 3D, 3E, 3G)[4]

24. In addition to the trusts that are named as defendants in this action, Fay created several other trusts the assets of which were nursing homes, including the Clay Nursing Home Trust, owner of the Exeter House Nursing Home; Dantim Nursing Home Trust, owner of Forest Manor Nursing Home; and the Mildred Alford Nursing Home Trust, owner of the Mildred Alford Nursing Home. At least with respect to the Clay Nursing Home Trust and the Dantim Nursing Home Trust, Fay was the settlor, the sole trustee and a named beneficiary. Under both declarations of trust, Fay retained the right to alter, amend or revoke the trust. With respect to the Mildred Alford Nursing Home Trust, Fay was the settlor, and a co-trustee with her sister, Dzialo. (Exh. 5A, 6A, 7A)

25. On June 21, 1976, Fay, as trustee, conveyed the Exeter House Nursing Home and the Forest Manor Nursing Home, together with the land upon which they were situated to Almeida, as trustee of two different trusts, for $10,000.00. Both of these transactions were subject to an amended agreement in September of 1976 which significantly increased the purchase prices. In each instance Fay, as trustee, took back mortgages from Almeida. (Exh. 5C, 5D, 6C, 6D)

26. Similarly on June 29, 1976, Fay and Dzialo as trustees conveyed the Mildred Alford Nursing Home together with the land upon which it was situated to one Gilbert Rocha, as trustee of the M.A. Nursing Home Trust, for $25,000.00. A confirmatory deed was later filed increasing the purchase price. On September 9, 1976 Dzialo resigned as a trustee of the Mildred Alford Nursing Home Trust. (Exh. 7C, 7D, 7E, 7F, 7G, 7H, 7I, 7J)

27. Marie Boose worked as a part-time nurse's aide at the Chester Manor Nursing Home from 1964 through 1966. (TR2–8–9) Ms. Boose returned to the same employment in 1970 and continued in that capacity until 1974 when she became a relief cook at the nursing home. (TR2–9–11) At that time, Fay ran the Chester Manor Nursing Home. (TR2–11)

28. In 1976, at Fay's suggestion, Ms. Boose began working in the office at the Exeter House Nursing Home, another facility oper-

---

4. The documentary evidence with respect to this transaction is quite confusing. The deed dated June 21, 1976 conveying the Highland Avenue Nursing Home and property from Fay as trustee of Highland Avenue to Almeida as trustee of the Highland Nursing Home Trust indicates that the full consideration for the conveyance was $10,000.00. (Exh. C) On the same date, June 21, 1976, Almeida, as trustee of the Highland Nursing Home Trust, granted a mortgage to Highland Avenue on the conveyed property in the amount of $210,000.00. (Exh. 3G) Again on the same day, June 21, 1976, Fay, as trustee of Highland Avenue, assigned the note and all her right, title and interest in all the secured property to secure the note for $210,000.00 to Specialized Services, Inc. (Exh. 3I at p. 14) On September 8, 1976, pursuant to the amended agreement, Almeida as trustee of the Highland Nursing Home Trust executed a $25,000.00 chattel mortgage and a $97,349.19 mortgage in favor of Fay as trustee of Highland Avenue. (Exh. 3D at pp. 6–7, 10–11) On the same day, September 8, 1976, Fay as trustee of Highland Avenue and Fay as President and Treasurer of Specialized Services, Inc. in two separate documents, acknowledged satisfaction of the $210,000.00 mortgage. (Exh. 3I at p. 15–16) On September 9, 1976, Fay as trustee of Highland Avenue assigned the $210,000.00 mortgage to one Barbara Buonato. (Exh. 3I at p. 17) On August 26, 1977 Fay as trustee of Highland Avenue assigned the $97,349.19 mortgage to Barbara Buonato indicating that the September 9, 1976 assignment referred to a discharged mortgage, i.e., the $210,000.00 mortgage. (Exh. 3I at p. 18) Finally on November 15, 1977, Barbara Buonato assigned the $97,349.14 mortgage back to Fay as trustee of Highland Avenue. (Exh. 3I at p. 19)

ated by Fay, doing payroll and managing the day-to-day activities in the office. (TR2–12–14) Ms. Boose kept track of the hours that employees worked both at the Chester Manor Nursing Home and the Exeter House Nursing Home. (TR2–15)

29. In approximately May of 1976, Ms. Boose became involved with invoicing, essentially matching slips up with statements and filing them in alphabetical order. (TR2–16) Neither Ms. Boose nor anyone to her knowledge made any ledger entries with respect to the invoices. (TR2–16) Fay would write the checks to pay the bills. (TR2–17)

30. Ms. Boose performed similar services for the Forest Manor Nursing Home, paying bills as directed by Fay. (TR2–19) Ms. Boose performed all of her duties while located at the Exeter House Nursing Home. (TR2–20)

31. Each of the nursing home facilities had its own operations account. (TR2–22–23)

32. In May or June of 1976, Fay told Ms. Boose that the Commonwealth of Massachusetts was conducting criminal investigations with respect to the nursing homes with which Ms. Boose was involved. (TR2–27–28; 2–36–39) Fay advised Ms. Boose at that time that she was going to transfer the nursing homes "in name only", but that Fay would continue to operate them. (TR2–35) Subsequent to that conversation, Almeida was introduced to Ms. Boose as the new owner of the nursing homes. (TR2–35; 2–42) In 1976, Ms. Boose and Fay had conversations concerning the use of trusts to protect assets during which Fay told Ms. Boose that a trust cannot be touched. (TR2–40)

33. Prior to the time that the nursing homes were transferred to Almeida, Ms. Boose reported only to Fay. Subsequent to the transfers, Ms. Boose continued to report to Fay. (TR2–43)

34. After the transfers of the nursing homes, Almeida personally signed the checks on the nursing home accounts for approximately three months. (TR2–43–44) Thereafter a signature stamp with Almeida's signature would be used. (TR2–44–45) Fay would direct Ms. Boose as to which invoices to pay, and Ms. Boose would write the check and use the Almeida signature stamp to pay the bill. (TR2–45–46)

35. When tax liens were placed on the accounts of certain nursing homes, Ms. Boose would deposit checks payable to those nursing homes in different accounts that were not subject to liens on Fay's instructions. (TR2–47–48)

36. In 1977 during the period that Fay was incarcerated, Ms. Boose continued to receive instructions with respect to the operations of the nursing homes from Fay. (TR2–49–53) Fay continued to direct the business of the nursing homes when she was released from prison. (TR2–53–59) During this period, Ms. Boose did not receive any directions or instructions from Almeida. (TR2–59)

37. Ms. Boose did not maintain any ledgers or books with respect to the operations of the nursing homes with which she was involved. (TR2–59)

38. At times employees on the payroll of one nursing home would perform services at other nursing homes or properties owned by Fay. (TR2–60)

39. Ms. Boose was directed to pay invoices for supplies used for other properties out of nursing home accounts. (TR2–64–66) Fay instructed Ms. Boose to pay Fay's court fees and fines with nursing home funds. (TR2–67–68)

40. After the transfer of the nursing homes to Almeida, Ms. Boose only on one occasion wrote a check as a mortgage payment to Fay. (TR2–71–73)

41. In 1978, Fay asked Ms. Boose if she would be interested in purchasing the Exeter House Nursing Home, the Chester Manor Nursing Home and the Forest Manor Nursing Home, the three facilities with which Ms. Boose was involved. (TR2–74–74) Ms. Boose responded in the negative because she was not financially qualified to buy them. (TR2–74) Approximately one month or so thereafter, in August of 1978, Ms. Boose left the employ of the nursing homes. (TR2–73–74)

42. After the transfer of the nursing homes to Almeida, Ms. Boose saw Almeida frequently and they discussed the books, the hiring and firing of personnel and the pur-

chase of necessities for the nursing homes. (TR2–80)

43. Freeman R. Violette was the administrator at the Parker Hill Nursing Home at the time Fay purchased the facility. (TR2–109–110)

44. Normally Mr. Violette would receive the check for the Parker Hill Nursing Home directly from the state. At some point after Fay purchased the nursing home, she told Mr. Violette that she was having difficulty collecting monies for some of her nursing homes. Thereafter, Fay would pick up the check, use the money, and subsequently turn the payment over to the nursing home after a few days. (TR2–116–118)

45. Mr. Violette was terminated by Fay in July of 1977. (TR2–111)

46. The Parker Hill Nursing Home had two separate bank accounts, one for the nursing home and one for the patients' funds. The bookkeeper at the nursing home kept track of all of the transactions in the ledgers. (TR2–121–124)

47. All of the employees at the Parker Hill Nursing Home were paid from the nursing home account. (TR2–122)

48. Ann Condon was employed as a licensed practical nurse at the Exeter House Nursing Home from 1971 through 1973. (TR2–129–130)

49. At times Ms. Condon worked for both Exeter House Nursing Home and Chester Manor Nursing Home, splitting shifts at the two facilities to cover if someone did not show up for work. (TR2–132–133) Ms. Condon's pay check would be issued from the Exeter House Nursing Home. (TR2–133)

50. On June 18, 1976 the Commonwealth of Massachusetts filed a lawsuit against Fay. (Exh. 9A) That same day, Fay's attorney was served with a copy of the complaint and ex parte motion for approval of real estate attachment. (Exh. 43, 44) On the same date, the Commonwealth got a writ of attachment against Fay in the amount of $400,000.00 which was recorded on June 21, 1976. (Exh. 9A)

51. On February 25, 1972 on an application for registration as a nursing home administrator filed with the Board of Registration of Nursing Home Administrators for the Commonwealth of Massachusetts, Fay represented that she was the owner of the Chester Manor Nursing Home from 1967 to the present. (TR3–22)

52. In March of 1974, Fay represented to a bank that she was the owner of the Parker Hill Nursing Home. (Exh. 35)

53. Until the transfers to Almeida, Fay was the sole signatory on the bank accounts of the Green Pastures, Forest Manor, Parker Hill and Highland Avenue trusts. (TR3–31–32)

54. In September of 1976, an attorney representing Fay admitted in an answer to an amended complaint that Fay was the sole proprietor of the Exeter House Nursing Home, the Forest Manor Nursing Home and the Green Pastures Nursing Home until June, 1976. (Exh. 45, ¶ 12, Exh. 46, ¶ 1)

55. The corporate defendant never made a dividend distribution. (TR2–158)

56. The corporate defendant was dissolved by the secretary of state for the Commonwealth of Massachusetts in October of 1983. (Exh. 34)

57. Notice of federal tax lien under internal revenue laws against Fay in the amount of $200,213.45 was filed on October 31, 1979. (Exh. 16)

58. The United States of America has a judgment against Fay in the amount of $699,-142.21 plus interest entered on December 30, 1990. (TR3–53–54)

### III. CONCLUSIONS OF LAW

■ At the outset, the defendants once again attempt to raise the specter of the untimeliness of the government's claims. This ghost was clearly and unequivocally put to rest in Judge Zobel's Memorandum of Decision on summary judgment, to wit:

If the United States can prove that the corporate and trust defendants were the alter egos of Claire Fay, it has satisfied the statute of limitations ... It is equally clear, however, that when parties are shown to be alter egos, their separate structures are disregarded and they are

rendered a sole entity. If limitations and notice provisions are satisfied with respect to one entity, they are, accordingly, satisfied with respect to the other.

Memorandum of Decision, # 89 at pp. 8–9 (citations omitted) This is the law of the case, and the ruling shall not now be revisited.

■ The same must be said with respect to the legal standard applicable in proving alter ego in this case. While the United States acknowledges that Judge Zobel decided the issue, i.e., that Massachusetts state law as opposed to federal law controls, there appears to be some equivocation in the government's post-trial brief. (See # 116 at p. 8 n. 2) Again, the law of the case has been established, and it shall be applied accordingly.

These preliminaries aside, the primary legal questions in this litigation may be addressed.

### A. Alter Ego

■ The seminal decision articulating the corporate disregard doctrine under Massachusetts law is *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 233 N.E.2d 748 (1968). Therein the Supreme Judicial Court observed that piercing the corporate veil may be warranted "... in rare particular situations in order to prevent gross inequity." *Id.,* 353 Mass. at 620, 233 N.E.2d at 752. Such an occasion would arise

(a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

*My Bread Baking Co. v. Cumberland Farms, Inc., supra,* 353 Mass. at 619, 233 N.E.2d at 752.

■ The factors to be considered were further refined when the Appeals Court in the case of *Evans v. Multicon Construction Corporation,* 30 Mass.App.Ct. 728, 574 N.E.2d 395 (1991), adopted the criteria espoused by the First Circuit in *Pepsi–Cola Metropolitan Bottling Co. v. Checkers,* 754 F.2d 10, 14–16 (1 Cir.1985). As delineated by the Massachusetts court, the

... twelve factors which should be considered in deciding whether to penetrate the corporate form (are): (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; (12) use of the corporation in promoting fraud.

*Evans v. Multicon Construction Corp., supra,* 30 Mass.App.Ct. at 733, 574 N.E.2d at 398.

When analyzing the relevant criteria, the Appeals Court admonished that "... the exercise is, of course, not one in counting. One examines the twelve factors to form an opinion whether the overall structure and operation misleads." *Id.,* 30 Mass.App.Ct. at 736, 574 N.E.2d at 400.

■ In the present case, the government contends that the defendant corporation and trusts are the alter egos of Fay. With respect to the first factor, Fay was the President and Treasurer and, for at least a number of years, the sole stockholder of the corporate defendant. As to the trusts, Fay was the settlor, the sole trustee, and a named beneficiary of each.

It is also clear, based on the facts as found, that Fay exercised control over the defendant entities. As President and Treasurer of the corporate defendant, she conveyed all of its assets to third parties. The same is true with respect to the trust defendants. Fay was the sole signatory on the bank accounts of each of the trust defendants; she directed

which bills should be paid. Further, as concerns the trusts, Fay was the settlor, sole trustee and a named beneficiary, retaining significant rights and benefits under the declarations of trust. There is little question that she exercised pervasive control of the defendant entities.

To the extent that some employees were paid by one entity while working for another, there is evidence of intermingling of business assets. The use of state funds or other checks to cover expenses at one or another nursing home is likewise indicative of an intermingling. At the same time, there is no dispute that the corporate and trust defendants maintained separate bank accounts and had separate administrators. Moreover, each transaction or conveyance was individually undertaken with the formal documentation filed in the respective registry of deeds.

There has been no evidence presented in this case to support a finding of thin capitalization. Indeed it is the defendant entities' rights to the monies raised by the sale of the nursing homes on which they held mortgages that is at issue. Further, there is no evidence that the defendant entities were insolvent at the time that their assets, i.e., the nursing homes, were transferred; each took back mortgages in the conveyances.

It appears from the record that corporate formalities, as discussed hereinabove, were observed. The fact that the corporate defendant was dissolved by the state could equally have been due to inactivity than any other reason. Ms. Boose testified that she did not keep records of the finances of one of the trust defendants; Mr. Violette testified that he did. None of the records of any of the defendants have been produced at trial.

While Fay testified that the corporate defendant had never paid a dividend to stockholders, there was no testimony as to whether the trusts had made any disbursements to the beneficiaries. There is no basis for finding that the defendant entities were insolvent at any time, indeed, the opposite is true. Although the assets of the defendant entities were transferred to a person with whom Fay enjoyed a long-term relationship, the facts do not support a conclusion that they were "siphoned away" essentially in light of the interpleader fund. This conclusion is belied somewhat by the fact that the assets of the corporate defendant, other than the nursing home, were conveyed for no consideration to entities in which Fay had an apparent interest. Apart from the outward appearances, however, it has not been demonstrated that Fay benefitted from these transactions.

The documentary evidence demonstrates that Fay, in each instance, at least purportedly acted in her official capacity vis-a-vis the defendant entities. Overall, although the various conveyances on their face appear suspect, particularly given their timing and the surrounding circumstances, it has not been established that the defendant entities were used to promote fraud or that Fay used the defendant entities for her own benefit.

The evidence in this case undoubtedly gives rise to the impression that the relationship between Fay and the defendant corporation and trusts was less than above-board. However, considering the relevant criteria under Massachusetts law, the government has failed to carry its burden of proving that the defendant entities were, in fact, the alter egos of Fay.

### B. The Trusts

#### 1. Massachusetts Law

The government argues that the federal tax liens against Fay individually attached to the assets of the defendant trusts consequent to the extensive powers and interests that she reserved to herself in creating them. Once again, the merit of this claim is to be determined under state law. *Helvering v. Stuart*, 317 U.S. 154, 161, 63 S.Ct. 140, 144, 87 L.Ed. 154 (1942) ("Grantees under deeds, wills and trusts, alike, take according to the rule of the state law. The power to transfer or distribute assets of a trust is essentially a matter of local law.") It appears that Massachusetts law on this point is evolving. An historical perspective of the cases is in order.

In 1944, the Massachusetts Supreme Judicial Court addressed the issue of the proper distribution of property under a will and a trust in the case of *National Shawmut Bank of Boston v. Joy*, 315 Mass. 457, 53 N.E.2d 113 (1944). Pursuant to the terms of the

trust, Nicholls, the settlor, was to be paid a sum certain monthly from the trust res or income, and such other payments as the trustees, in their discretion, deemed necessary. After Nicholls' death, payments from the trust principal and/or income were to be paid to one Sophia Brown during her life. Upon Ms. Brown's death, the trust property was to be paid either to such person as appointed by Nicholls or, in default of such appointment, under the laws of intestacy. The trustees of the Nicholls' trust were a bank and a third party.

Nicholls died without exercising the power of appointment reserved to him pursuant to the terms of the trust and the legatees under his will sought to claim the trust property. In deciding that the heirs at law were entitled to the trust res, the Supreme Judicial Court concluded, inter alia, that

> ... where a settlor reserves to himself not only a life interest but also a general power of appointment, the exercise of which would defeat provisions for the distribution of the trust property in default of appointment, the existence of the power does not make the trust property the property of the settlor nor make testamentary the provisions made in default of appointment ...

> Nicholls reserved to himself also power to 'alter, amend or revoke' the trust. The power to revoke, if not a kind of power of appointment ..., is akin to such a power. It is not property, and apart from the Bankruptcy Act cannot be reached by creditors ... Until a power to revoke is exercised, the interests created by the trust instrument remain unaffected.

*National Shawmut Bank of Boston v. Joy, supra,* 315 Mass. at 473–474, 53 N.E.2d at 123–124 (citations omitted)

That same year, the Supreme Judicial Court refused to require the settlor of a trust to exercise his power of revocation for the benefit of a creditor, reiterating that such a "power cannot be reached by creditors." *Guthrie v. Canty,* 315 Mass. 726, 728, 53 N.E.2d 1009, 1010 (1944). The court arrived at that conclusion after determining that the settlor's conveyance of certain real estate into a trust did not render the settlor insol-

vent and, consequently, the transfer was not fraudulent.

Ten years later, in the case of *Ware v. Gulda,* 331 Mass. 68, 117 N.E.2d 137 (1954), the issue before the Supreme Judicial Court was whether a creditor could reach and apply a trust fund to satisfy a debt The circumstances were that the settlor had created a trust with her own property with the income and/or principal of the trust to be expended for herself as the sole beneficiary during her lifetime in the discretion of the named trustee. The settlor was still living when a creditor sought payment from the trust res.

In deciding the question in favor of the creditor, the court applied the rule of the Restatement of Trusts § 156(2), to wit:

> 'Where a person creates for his own benefit a trust for support or a discretionary trust, his transferee or creditors can reach the maximum amount which the trustee under the terms of the trust could pay to him or apply for his benefit.' It has substantial support in authority ... Although every exercise of the power might take property away from the remaindermen, that is no objection where the trustee could pay the entire principal to the creator of the trust.

*Ware v. Gulda, supra,* 331 Mass. at 70–71, 117 N.E.2d at 138 (citation omitted).

The Appeals Court acknowledged the teaching of the *Ware* decision in 1979, writing:

> During the lifetime of the settlor, to be sure, the bank (creditor) would have had access to the assets of the trust. When a person creates for his own benefit a trust for support or a discretionary trust, his creditors can reach the maximum amount which the trustee, under the terms of the trust, could pay to him or apply to his benefit ... This is so even if the trust contains spend thrift provisions.

*State Street Bank and Trust Company v. Reiser,* 7 Mass.App.Ct. 633, 636, 389 N.E.2d 768, 770 (1979) (citations omitted).

The issue in the *Reiser* case was whether a creditor could satisfy an indebtedness of a settlor of a trust from the trust res after the settlor's death.

Pursuant to the terms of the trust instrument in question, the settlor had retained both the power to amend or revoke the trust as well as the right to direct payments from the trust during his lifetime. Shortly after receiving a significant loan from a bank, the settlor died in an accident, and his estate was inadequate to repay the debt. While recognizing that "[t]raditionally the courts of this Commonwealth have always given full effect to inter vivos trusts, notwithstanding retention of powers to amend and revoke during life", the Appeals Court also noted "... another thread of decisions which takes cognizance of, and give effect to, the power which a person exercises in life over property." *State Street Bank and Trust Company v. Reiser, supra,* 7 Mass.App.Ct. at 636–637, 389 N.E.2d at 770–771.

The Appeals Court, after discussing the holding of *United States v. Ritter,* 558 F.2d 1165 (4 Cir., 1977), held in somewhat of a watershed ruling:

> ... that where a person places property in trust and reserves the right to amend and revoke, or to direct disposition of principal and income, the settlor's creditors may, following the death of the settlor, reach in satisfaction of the settlor's debts to them, to the extent not satisfied by the settlor's estate, those assets owned by the trust over which the settlor had such control at the time of his death as would have enabled the settlor to use the trust assets for his own benefit.

*State Street Bank and Trust Company v. Reiser, supra,* 7 Mass.App.Ct. at 638, 389 N.E.2d at 771; *See, In re Cowles,* 143 B.R. 5, 9 (D.Mass., 1992) ("Commentators have noted that the importance of this case and others arriving at the same conclusion should not be underestimated, as prior to these recent decisions, a power of revocation was not regarded as an interest in property reachable by creditors.")

The Appeals Court in *Wolfe v. Wolfe,* 21 Mass.App.Ct. 254, 486 N.E.2d 747 (1985) followed the rationale of the *Ware* case. Where the settlor and co-trustee of a trust retained the right to withdraw his percentage interest in the principal of the trust during his lifetime, as well as the power to amend or revoke the trust, the court concluded that a creditor, while the settlor was alive,

> ... now can reach the maximum amount which (at his request or otherwise) may be reached by, or paid to, (the settlor) under the terms of the trust. It has long been established that creditors can reach such a settlor's trust to that extent.

*Wolfe v. Wolfe, supra,* 21 Mass.App.Ct. at 257, 486 N.E.2d at 749 (citations omitted).

Finally, in *ITT Commercial Finance Corp. v. Stockdale,* 25 Mass.App.Ct. 986, 521 N.E.2d 417 (1988), the settlor created a real estate trust naming himself as trustee and his children as beneficiaries. As trustee, the settlor enjoyed "copious powers" with respect to the trust. A creditor sought to satisfy an indebtedness against the trust upon the settlor's death, and the successor trustees resisted. Following the decision in *Reiser,* the Appeals Court held:

> In view of the settlor's power to amend and revoke the trust and to substitute beneficiaries, a power retained until death, summary judgment could also rest on the creditor's right to reach the trust property as if it had been the debtor's own.

*ITT Commercial Finance Corp. v. Stockdale, supra,* 25 Mass.App.Ct. at 988, 521 N.E.2d at 418.

It is of interest to note that in 1981, the First Circuit decided the case of *George v. Kitchens by Rice Bros., Inc.,* 665 F.2d 7 (1 Cir., 1981). In that case, the plaintiff had placed her home in a revocable inter vivos trust and, five years later, filed for bankruptcy. In response to a suit by the defendant creditor, the plaintiff contended that the house was included in the bankruptcy proceeding. The First Circuit upheld the bankruptcy court's decision that the real estate fell outside the bankruptcy jurisdiction, writing

> ... the fact that plaintiff reserved the power to revoke the trust does not call for a different result; in contrast to the situation in some states ..., such a power of revocation under Massachusetts law is not considered property ... and cannot be reached by creditors.

*George v. Kitchens by Rice Bros., Inc.,* *supra,* 665 F.2d at 8 (citations omitted). The First Circuit did not cite the *Reiser* opinion nor was there any mention of any powers in the settlor over and above the power to revoke.

■ Having reviewed the pertinent caselaw at length, the guiding principles of law may be simply stated and readily applied. First, no Massachusetts court to date has permitted a creditor to force a settlor to exercise a power to amend or revoke a trust during his or her lifetime in order to pay an indebtedness. Second, when a settlor creates a trust for his or her own benefit, and further retains extensive powers under the terms of the trust, a creditor may reach the assets of the trust to the maximum extent of the settlor's interest.

### 2. The Parker Hill and Green Pastures Trusts

■ Fay was the settlor, the sole trustee and a named beneficiary of each of the defendant trusts. Fay's rights and powers pursuant to the provisions of each of the declarations of trust are, as described by the Appeals Court in the *ITT Commercial Finance Corp.* case, "copious." As indicated, *supra,* at pp. 598–599, the declarations of trust for Parker Hill and Green Pastures provide that "Claire M. Fay ... reserves to herself the right to alter amend and revoke this trust, in whole or in part and to terminate the same ...". I rule that the United States, as a creditor of Fay, is entitled as a matter of law to reach that portion of the interpled fund as represents proceeds from the sale of assets of these two trusts.

### 3. The Highland Avenue Trust

■ The terms of the declaration of trust for Highland Avenue are different from those of the declarations establishing Parker Hill and Green Pastures. To be blunt, the declaration establishing the Highland Avenue trust is drafted in such a way that it is very difficult to discern what it means. One is left with the strong suspicion that it was drafted so as to give the trustee free reign but also so as to contain other language purporting to constrain the trustee merely to have some-

thing at which to point if the trust were attacked. To the extent that the document is ambiguous, the ambiguity is to be construed against the drafter, in this case, the settlor, Fay.

■ Pursuant to the terms of the declaration of trust, Fay, as trustee, is, in the second paragraph 4, "authorized to manage and maintain the trust property and proceeds of the trust." In paragraph 6, specific authority is granted:

(a) To make all such contracts as she may deem expedient in the conduct of the business of the Trust.

(b) From time to time to sell, mortgage, pledge, lease, exchange or otherwise dispose of, at public or private sale, any or all of the trust property, whether real or personal, for such price, either in cash, or the stocks, shares, or securities of other corporations, trusts, or associations, upon such terms as to credit or otherwise, as she may deem expedient.

(c) To guarantee or assume the obligations of corporations, trusts or associations, and to enter into such agreements by way of indemnity or otherwise, as she may deem expedient in connection with the acquisition of property from the subscribers as herein-before (sic) provided or otherwise.

(d) To confer, by way of substitution, such power and authority on officers and agents, appointed by her, as she may deem expedient.

(e) To borrow money for the purposes of the trust and give the obligations of the trust therefor.

(f) To loan any money from time to time in the hands of the Trustee, with or without security, on such terms as she may deem expedient.

(g) To subscribe for, aquire (sic), own sell, or otherwise dispose of such real or personal property, including stocks, shares and securities of any other corporation, trust or association as she may deem expedient in connection with the purposes of the trust.

(h) To vote in person or by proxy of all shares of stock at any time held by her,

and to collect and receive the income, interest and profits of any such stock or securities.

(i) To collect, sue for, receive and receipt for all sums of money at any time become due to said trust.

(j) To employ counsel, and to begin, prosecute, defend and settle suits at law, inequity or otherwise, and to compromise or refer to arbitration any claims in favor of or against the trust.

(k) And, in addition, to do all such matters and things as in her judgement (sic) will promote or advance the business which she is authorized to carry on, although such matters and things may be neither specifically authorized nor incidental to any matters or things specifically authorized.

Paragraph 21 provides that the trust can "... be amended or altered in any part whatever ... with the consent of a majority percentage of vote ..." of the beneficiaries. Paragraph 20 provides that the "trust may be terminated ... by a majority vote of all the shares outstanding at a meeting of the Trustee and beneficiaries, called for that expressly stated purpose." Paragraph 4 recites that the beneficiaries of the trust are Fay, her sister, and her two sons "in equal shares."

The declaration seems to make a distinction between "principal and income" of the trust, "property" of the trust, and "beneficial interests" of the trust. The beneficiaries are said to hold a "beneficial interest" and are said to be "holders of the shares" of beneficial interests in the trust. *See* ¶¶ 13, 5(1st). The first sentence of paragraph 15 provides that:

15. Beneficial interests hereunder shall be personal property, giving only the rights in this instrument specifically set forth.

In paragraph 13, it is stated that:

13. The shares of the beneficial interests hereby created shall not be transferable or assignable without first offering said share to the other beneficiaries in writing.

Paragraph 23 stipulates that:

23. The interest of any beneficiary hereunder, either as to income or to principal, shall not be anticipated, alienated, or in any manner assigned by such beneficiary and shall not be subject to any legal process, bankruptcy proceedings, or the interference or control of creditors or others, nor the subject matter of any contract or trust made or entered into by any beneficiary.

The trustee's powers with respect to the "property" of the trust are extensive. The first paragraph 5 provides:

5. In extension and not in limitation of the powers she will have by law or other provisions of this DECLARATION OF TRUST, the Trustee shall have the following powers and discretions with respect to this trust and its property, in each case to be exercised from time to time in her discretion and without order or license of court:—

The Trustee shall hold said property and cash so to be acquired by her, as well as all other property which she may acquire as such Trustee together with the proceeds thereof, in trust, to manage and dispose of the same for the benefit of the holders of the shares hereunder in the manner and subject to the stipulations herein contained ...

The second paragraph 5 recites that:

5. The Trustee shall hold the legal title to all property at any time belonging to this trust, and subject only to the specific limitations herein contained, she shall have absolute control, management and disposition thereof, and shall likewise have absolute control of the conduct of all business of the trust, and the following enumeration of specific duties and powers shall not be construed in any way as limitation upon the general powers intended to be conferred upon her.

As indicated, *supra*, paragraph 6 provides, in pertinent part:

6. The Trustee shall have authority:

\* \* \* \* \* \*

(b) From time to time to sell, mortgage, pledge, lease, exchange or otherwise dispose of, at public or private sale, any or all of the trust property, whether real of personal, for such price . . . upon such terms as to credit or otherwise as she may deem expedient.

The last sentence of paragraph 15 stipulates that:

The ownership of a beneficial interest hereunder shall not entitle the beneficiary to any title in or to the trust property whatsoever, or right to call for an partition or division of the same, or for an accounting.

It is to be recalled that in paragraph 23, the declaration states that the "interest of any beneficiary hereunder, either as to income or to principal . . .".

In sum, what the beneficiaries have are "shares of beneficial interests" in the trust. These cannot be transferred or assigned without first offering the shares to the other beneficiaries. An owner of a beneficial interest does not have any title in the "trust property;" what he has an a "beneficial interest" which is "personal property, giving only the rights in [the trust] instrument specifically set forth." The power to amend, alter or terminate the trust can only be exercised by a majority of the beneficiaries.

The trust has "property" which is also referred to as "trust property." In paragraph 23, the declaration seems to indicate that beneficiary has an "interest . . . as to income or to principal . . .". The powers of the trustee as to "trust property" are plenary.

Lastly, paragraph 11 recites:

11. The Trustee, may, subject to the limitations herein expressed, acquire, own, and dispose of any interest in this trust to the same extent as if she were not a Trustee.

The question then becomes what is meant by the term "interest" in this paragraph? With one exception, every other time the term "interest" is used in the declaration, it is said to be a "beneficial interest." If "interest" in paragraph 11 meant "beneficial interest," the paragraph would be meaningless since the manner of acquiring, owning and disposing of "beneficial interests" is set forth with some specificity.

The only other time that the word "interest" is used without being preceded by the adjective "beneficial" is in paragraph 23 wherein it speaks of "[t]he interest of any beneficiary hereunder, either as to income or to principal . . .". Thus, applying the text of the instrument itself and construing paragraph 11 so it has meaning, the inescapable conclusion is that "interest" means the "principal and income" of the trust, and paragraph 11 gives the trustee power to treat that principal and income as her own. To the extent that she does so, the "shares" of the beneficiaries or their "beneficial interests" are worth less, or perhaps even worthless, but by its terms, the trust provides that they have no property interest in the "trust property."

Of course, paragraph 11 contains the phrase "subject to the limitations herein expressed." However, the only limitation imposed on the trustee as to the property of the trust is no limitation at all. While the first paragraph 5 states that the trustee shall hold the trust's property in trust and to manage and dispose of the same for the benefit of the holders of the shares, the first sentence of the second paragraph 5 states that the enumerated "powers and discretions" which follow are "[i]n extension and not in limitation of the powers she will have by . . . other provisions of . . ." the declaration of trust.

The foregoing discussion illustrates the difficulty in construing in a logical and common-sense fashion a trust instrument which it appears was drafted so as to obfuscate the precise powers and responsibilities of the trustee. However, to the extent there are ambiguities, they are to be construed against Fay.

I find that paragraph 11 gives Fay such power over the principal and income of the trust that said principal and income are in effect her property. In the words of the Appeals Court in *Reiser,* she has "place[d] the property in trust and [has] reserve[d] the right to . . . direct disposition of principal and income." *Reiser, supra,* 7 Mass.App.Ct. at 638, 389 N.E.2d at 771. To the same

effect is *State Tax Commission v. Fitts,* 340 Mass. 575, 580, 165 N.E.2d 586, 590 (1960). I rule that the United States is entitled to the proceeds of the sale of the assets of Highland Avenue.

### IV.  CONCLUSION

Subject to the award of $16,970.00 to the defendants Gens and Wine by summary judgment, the United States is entitled to judgment in the amount realized from the sale of the assets of the Parker Hill, Green Pastures, and Highland Avenue trusts in order to satisfy the tax indebtedness of Fay and the Regina Nursing Home, Inc. is entitled to judgment in the amount realized from the sale of the assets of Regina Nursing Home, Inc.