WINCHESTER GABLES, INC. *vs.* HOST MARRIOTT CORPORATION
& others.[1]

No. 06-P-1209.

Suffolk. May 8, 2007. - October 30, 2007.

Present: GELINAS, VUONO, & SIKORA, JJ.

*Practice, Civil,* Summary judgment. *Evidence,* Parol evidence. *Contract,* Construction of contract, Sale of real estate, Performance and breach, Implied covenant of good faith and fair dealing, Impossibility of performance. *Law of the Case. Real Property,* Sale. *Words,* "Actual gross consideration."

A trial judge did not err in excluding parol evidence relating to the interpretation of a provision in a purchase and sale agreement (agreement), where the agreement included an explicit integration clause stating that the agreement contained the entire understanding between the parties, and where the admission of such evidence would not merely clarify a possible ambiguity, but would impermissibly broaden an integrated writing [590-593]; further, an earlier conclusion by a motion judge that the agreement contained an ambiguity did not limit the trial judge's power to rule differently [593].

A trial judge erred as a matter of law in failing to give meaning to certain unambiguous language contained in a purchase and sale agreement regarding the calculation of additional compensation to be paid to the original seller after the buyer resold the subject facility in an undifferentiated portfolio sale [594-597]; however, where proof of bad faith was lacking at trial, there was no error in the judge's determination that the disposal of the facility in such a sale neither constituted a breach of the implied contract of good faith and fair dealing [597-598] nor violated G. L. c. 93A [598].

CIVIL ACTION commenced in the Superior Court Department on April 30, 2003.

Motions for partial summary judgment were heard by *Margot Botsford,* J., and the case was heard by *Ralph D. Gants,* J.

*John P. Dennis* for the plaintiff.

*Randall K. Miller* (*Juan Alexander Concepcion* with him) for the defendants.

GELINAS, J. In this case the terms of the purchase and sale

[1]Barcelo Crestline Corporation and LTJ Senior Communities LLC.

agreement (agreement) between the parties failed to address a contingency that ultimately arose when the buyer later resold the property that was the subject of the agreement; the resale might have triggered additional compensation to the original seller, but the formula contained in the agreement for calculating the additional compensation did not contemplate a portfolio sale of properties.

The plaintiff, Winchester Gables, Inc. (Winchester), sold Winchester Gables, a 124-unit senior retirement community facility (facility), to the defendants, Host Marriott Corporation (Host Marriott), Barcelo Crestline Corporation (Crestline), and LTJ Senior Communities, LLC (LTJ) (sometimes referred to collectively as Host Marriott).[2] The agreement conditioned payment of additional sums by the defendants on a formula based on the "actual gross consideration" paid by a third-party purchaser, if the defendants later resold the facility within a specified period of time.

The defendants resold the facility, but did so in a transaction where the facility was part of an undifferentiated portfolio sale of thirty-one different properties for a single price of $606 million. In determining whether additional compensation was due Winchester as a result of the sale, the defendants suggested basing the calculation on the average price of each of the thirty-one properties, which resulted in no additional compensation to Winchester. Winchester rejected the defendants' approach, and demanded that the full consideration paid for the entire portfolio be used in calculating the "actual gross consideration" paid for the facility itself, which resulted in a claim for $1 million in additional compensation. In the alternative, Winchester claimed that the defendants had breached the agreement, and demanded payment of the amount specified in the liquidated damage clause, also set at $1 million. After a six-day bench trial, a judge of the Superior Court entered judgment of dismissal against Winchester on all claims, and this appeal followed.

*Facts.* The facts of the underlying transactions are largely undisputed. We summarize the facts as found by the trial judge, adding detail where relevant to the issues on appeal.

[2]Original negotiations were between Winchester and Host Marriott. The other defendants are wholly owned subsidiaries of Host Marriott that later held title to the facility.

By a written purchase and sale agreement dated December, 1997, Winchester agreed to sell the facility to Host Marriott. The agreement and sale were the culmination of negotiations begun in September, 1997, when John Carnella, Host Marriott's senior vice-president in charge of acquisitions, sent a letter of intent to Edward LeRoux, Jr., who controlled Winchester, proposing that Winchester sell the facility to Host Marriott for $24 million. The letter provided Host Marriott forty days to conduct due diligence. The letter expressly stated that, apart from certain provisions, it was not a binding contract and had no legal force until the agreement was executed by all parties. LeRoux signed the letter of intent on behalf of Winchester.

During the course of conducting its due diligence review, Host Marriott determined that the $24 million offer was excessive, and revised its offer. In oral discussion with LeRoux in October, 1997, and later confirmed by letter, Carnella proposed that Host Marriott pay Winchester $21 million in cash, with payment of an additional $1 million contingent on the future performance of the facility. In his letter to LeRoux, Carnella set forth the contingencies that would trigger an additional payment (contingent purchase price), which could not exceed $1 million. As proposed by Carnella:

1. On the fifth anniversary of the closing, Host Marriott would calculate its internal rate of return (IRR) based upon its aggregate investment in the facility and the actual net operating income (NOI) obtained from the facility. If the facility had not been sold, the calculation would assume a hypothetical sale on the fifth anniversary, with a hypothetical sales price calculated as follows: NOI multiplied by ten, less the customary costs of sale. If the IRR exceeded 13.5%, the excess proceeds, not to exceed $500,000, would be paid to Winchester as an additional purchase price.

2. On the tenth anniversary of the closing, Host Marriott would again perform these IRR calculations and would pay Winchester any proceeds above and beyond the 13.5% IRR, not to exceed an additional $500,000.

3. If the facility were sold before the fifth anniversary, the IRR would be calculated "on the date of sale according to the same procedure, but based upon the actual net sales proceeds."

If Host Marriott's IRR exceeded 13.5%, it would pay Winchester an amount above and beyond the 13.5%, not to exceed $1 million.

4. The IRR in all of these scenarios "would be calculated without reference to federal or state income taxes . . . ."

Carnella's proposal regarding the contingent purchase price and the method of its calculation was acceptable to Winchester, and was incorporated in the agreement as section 1.2.3. The language in section 1.2.3 remained unchanged throughout the negotiation of the agreement. The complete text of section 1.2.3 appears as the Appendix to this opinion.

It is clear from the record that the parties failed to discuss or anticipate the implications of the language of section 1.2.3 in the event of an undifferentiated portfolio sale. On January 12, 1998, Winchester agreed to substitute LTJ for Host Marriott as purchaser of the facility, and the actual conveyance of the facility was to LTJ rather than Host Marriott. The sale closed on January 16, 1998.

At the time of the execution of the agreement, LTJ was a shell, and Host Marriott expected it to be a single purpose entity, with the facility its sole asset. Host Marriott shared this expectation with Winchester during negotiations, but did not commit to it in the agreement. Winchester also did not ask Host Marriott to include such a commitment in the agreement.[3]

On December 30, 1997, after the execution of the agreement, but before the closing, Host Marriott assigned to LTJ an interest in the property of another retirement community, Leisure Park. As a result, LTJ was no longer a shell when it acquired the facility on January 16, 1998. Following a series of transactions in 1999 through which LTJ shed its other properties, it owned only the facility.

In December, 1998, Host Marriott "spun off" an affiliate, Crestline, and assigned its senior living properties, including the

---

[3]Although Carnella notes in an affidavit that Host Marriott "expected that the [facility] would be held by a single-purpose entity known as LTJ," he does not in any way indicate that this expectation was ever an obligation, promise, or other binding requirement of the agreement, or that such a requirement was contemplated by the parties as part of the agreement. Carnella states that "[a]t no time did the Parties ever discuss measuring the rate of return with regard to anything other than the [facility]."

facility, to Crestline. LTJ thus became a wholly-owned subsidiary of Crestline. This assignment did not trigger the obligation to calculate the contingent purchase price under section 1.2.3.3 of the agreement, because Crestline was an affiliate of Host Marriott. Crestline ultimately owned thirty-one senior living properties, including the facility. In January, 2002, Crestline sold its entire portfolio of thirty-one properties to Senior Housing Properties Trust (SNH) for a total of $606,474,808. No property in the portfolio, including the facility, was afforded a separate valuation or an individual accounting.

The sale of the facility to SNH triggered Host Marriott's obligation to Winchester under section 1.2.3.3 of the agreement to prepare a "disposition calculation" within sixty days based on the "actual gross consideration of the Disposition," in order to determine whether any part of the contingent purchase price should be paid. Host Marriott prepared a proposed disposition calculation. According to this calculation, and alternative calculations that Host Marriott performed to check the accuracy and fairness of the original disposition calculation, the IRR was below 13.5%. As the contingency was not met, Host Marriott maintained that no contingent purchase price was due, and Host Marriott so informed Winchester.

Winchester then filed this suit against the defendants, claiming both the $1 million contingent purchase price and G. L. c. 93A damages. Count I alleged breach of contract, count II alleged breach of the implied covenant of good faith and fair dealing, and count III alleged unfair and deceptive acts or practices in trade or commerce, in violation of G. L. c. 93A, § 11. Host Marriott filed a motion to dismiss the complaint, which was denied. Both Winchester and the defendants filed cross motions for partial summary judgment, which were heard by the same judge who denied the motion to dismiss.[4] The motion judge denied the cross motions, ruling that the agreement was

[4]Winchester claimed that it was entitled to partial summary judgment because the defendants materially breached the agreement by using "estimated proceeds" instead of "actual gross consideration" in performing the disposition calculation under section 1.2.3.3 of the agreement or, alternatively, because the defendants defaulted and therefore became obligated to pay liquidated damages under section 9.1.1 of the agreement. The defendants claimed that they were entitled to partial summary judgment because Winchester failed to

ambiguous to the extent that it did not address the meaning of the term "actual gross consideration" in the context of an undifferentiated portfolio sale.

The parties waived their rights to a jury trial, and a bench trial ensued, before a different judge, over six days in August, 2005. The trial judge issued detailed findings and conclusions of law, in which he dismissed all three counts of Winchester's complaint. Winchester has appealed, claiming error in (1) the motion judge's summary judgment ruling that the meaning of the term "actual gross consideration" was ambiguous in the context of an undifferentiated portfolio sale; and (2) the trial judge's finding in favor of the defendants on all counts.

1. *Motion for summary judgment.* Winchester claims on appeal that the motion judge erred in denying its motion for partial summary judgment. It argues that section 1.2.3.3 of the agreement was not ambiguous. "[T]he denial of motions for summary judgment and partial summary judgment will not be reviewed on appeal after a trial on the merits." *Deerskin Trading Post, Inc.* v. *Spencer Press, Inc.*, 398 Mass. 118, 126 (1986). "The merits of a claim are better tested on appeal on the record as it exists after an evidentiary trial." *Ibid.* The trial here was on the merits of the claim that formed the basis of the summary judgment motion. Cf. *Bacon* v. *Federal Kemper Life Assur. Co.*, 400 Mass. 850, 851 n.3 (1987).

2. *Parol evidence rule.* Winchester argues that the trial judge erred in excluding parol evidence relating to "the parties' mutual understanding that [the facility] would be sold as a stand-alone asset or a single purpose entity." In her decision on the summary judgment motion, the motion judge concluded that the phrase "actual gross consideration" was ambiguous in the circumstances of the case; Winchester claims that the motion judge's conclusion in this regard obliged the trial judge, as matter of law, to admit evidence to show an affirmative obligation on the part of Host Marriott to avoid disposing of the facility in an undifferentiated portfolio sale. We disagree.

---

offer proof of the occurrence of the express condition precedent to an obligation to pay the contingent purchase price, proof that the facility had achieved an IRR of more than 13.5%; the defendants also claimed that the liquidated damages provision was inapplicable to them. See note 9, *infra.*

The motion judge stated:

> "I consider the Carnella affidavit to raise but not resolve questions about the parties' intent. In particular, the affidavit suggests that in using the term 'actual gross consideration,' the parties intended to focus on the sale of only the [facility] (or ownership interest in only the [facility]. That still leaves open the question of how the contingent purchase price calculations should be performed if the sale of more than the [facility] is involved."

The motion judge further ruled that "the Agreement simply does not address itself to a situation where, as here, [the facility] is sold as part of a much larger, undifferentiated sale of many 'properties' that are not the subject of the Agreement."

"The parol evidence rule only bars the introduction of prior or contemporaneous written or oral agreements that contradict, vary, or broaden an integrated writing . . . . It does not bar extrinsic evidence that elucidates the meaning of an ambiguous contract." *Kobayashi* v. *Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 496 (1997). "[W]ritten agreements may not be varied or added to by parol evidence of antecedent or contemporaneous negotiations." *Sound Techniques, Inc.* v. *Hoffman*, 50 Mass. App. Ct. 425, 429 (2000). "Before that rule comes into operation, however, the court must be sure that it has before it a written contract intended by the parties as a statement of their complete agreement." *Ibid.* "[W]here a contract is so expressed as to leave its meaning obscure, uncertain or doubtful, evidence of the circumstances and conditions under which it was entered into are admissible, not to contradict, enlarge or vary its terms by parol, but for the purpose of ascertaining the true meaning of its language as used by the parties." *Waldstein* v. *Dooskin*, 220 Mass. 232, 235 (1915).

The agreement in this case includes an integration clause,[5] which the trial judge noted:

---

[5]Section 2.10 of the agreement provides:

> "Integration. This Agreement and the documents referenced in this Agreement contain the entire understanding between Seller and Purchaser with respect to the Property and are intended to be a full integration of all prior or contemporaneous agreements, conditions or undertakings between Seller and Purchaser. There are no promises, agreements,

"even if Host Marriott had told [Winchester] that it planned to assign the [facility] to a single-purpose entity, and [Winchester] had understood from this oral representation that Host Marriott would only sell the [facility] as a separate asset or through the sale of stock in a single-purpose entity, such a representation would not be legally binding under the integration clause unless that representation found its way into the [agreement]. This Court finds that it did not."

The trial judge seemed to recognize that receiving parol evidence would essentially be a penalty to Host Marriott for disposing of the facility in an undifferentiated portfolio sale; allowing parol evidence in this case would not merely clarify a possible ambiguity, but would impermissibly broaden the integrated writing.[6] See *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 755-756 (1973) ("the lease nowhere says that activities not expressly permitted are forbidden. . . . [but instead] simply does not deal with competition other than competition by lessees"); *Lydon* v. *Allstate Ins. Co.*, 5 Mass. App. Ct. 771 (1977) ("[t]he intent of the parties entering into the contract must be gathered from construing the contract as a whole and not by placing special emphasis on any one part").

Winchester asks us to conclude that since there was a finding of an ambiguity concerning the application of a single term, there was a basis for admitting evidence concerning any and all earlier negotiations, whatever their effect in rewriting or dramatically altering the meaning of the written agreement and despite the presence of an explicit integration clause.[7] We decline to do so. See *Blakeley* v. *Pilgrim Packing Co.*, 4 Mass. App. Ct. 19,

---

conditions, undertakings, warranties or representations, oral or written, express or implied, between Seller and Purchaser with respect to the Property other then [*sic*] as set forth in this Agreement and the documents referenced in this Agreement. Without limiting the generality of the foregoing, this Agreement supersedes in its entirety the letter of intent between Seller and Purchaser dated September 22, 1997."

[6]This point is amplified by the presence of language specifically authorizing Host Marriott to sell the facility as an asset or through the sale of "all or substantially all" of the stock in Host Marriott or LTJ, which the trial judge noted.

[7]In its briefs, Winchester repeatedly states that the motion judge "found the Contingent Purchase Price provision ambiguous." As noted by Host Marriott, the motion judge's finding was far narrower, noting ambiguity solely with

24 (1976) ("[t]he 'contemplation' of the parties . . . is not material where the agreement is unambiguous").

Although the parties do appear to have anticipated that LTJ would hold the facility as a single-purpose entity, that anticipation was never made a part of the agreement reflecting the contract between them. See *Hess Oil & Chem. Corp.* v. *Ristuccia*, 3 Mass. App. Ct. 772, 772 (1975) (absent finding of fraud or mistake, agreement is presumed to express whole intent of parties). There was no ambiguity whether the parties ever agreed to bind Host Marriott to dispose of the facility in an exclusive transaction or as the sole property of a single-purpose entity; the parties, whatever their intent for future action, did not agree to bind themselves to that intended future action, and did not agree to inflict a $1 million penalty upon Host Marriott in the event that Host Marriott chose not to carry out that nonbinding intent. See *Quirk* v. *Smith*, 268 Mass. 536, 543 (1929) ("[t]he unexpressed intent of one party cannot control the legal effect of that which was done").

The reliance that Winchester places on the "law of the case" doctrine set out in *King* v. *Driscoll*, 424 Mass. 1, 7-8 (1996), is misplaced. *King* refers to reconsideration of questions previously decided on appeal, not to reconsideration of questions previously decided in a motion decision. *Ibid.* To the extent that *Markham* v. *Fay*, 884 F. Supp. 594, 603 (D. Mass. 1995), reversed in part, 74 F.3d 1347 (1st Cir. 1996), uses the phrase "law of the case" to refer to a motion decision, it is unavailing on these facts. The "law of the case" that Winchester claims (ambiguity as to the meaning of the entire contingent purchase price provision) is not the "law of the case" that the motion decision actually established (ambiguity as to the application of the phrase "actual gross consideration" to a multi-property disposition).[8] Further, "a second judge does have the power to rule differently from the first judge on a 'case, an issue, or a question of fact or law once decided' in order to reach a just result." *Goulet* v. *Whitin Mach. Works, Inc.*, 399 Mass. 547, 554 (1987), quoting from *Salter* v. *Scott*, 363 Mass. 396, 401-402 (1973).

---

regard to the application of the phrase "actual gross consideration" to the facts of this case.

[8] See note 7, *supra*.

3. *Use of "allocated net fair value consideration."* Winchester argues that the trial judge improperly substituted "allocated net fair value consideration" for the term that appears in the agreement — "actual gross consideration." This argument, which is essentially an assertion of error in the refusal of the trial judge to credit the plain meaning of the phrase "actual gross consideration," we think, has merit.

"If a contract . . . is unambiguous, its interpretation is a question of law . . . . " *Seaco Ins. Co.* v. *Barbosa*, 435 Mass. 772, 779 (2002). While the trial judge was correct in his interpretation that the agreement in no way restrained the ability of Host Marriott to transfer the facility as part of an undifferentiated portfolio, he committed error of law in failing to give meaning to the unambiguous language requiring Host Marriott to compute the contingent purchase price using a formula based on the "actual gross consideration" obtained on disposition of the facility. This was protection for which Winchester had bargained. For its part, Host Marriott was free, in the negotiations leading up to the agreement, to bargain for a formula based on a different predicate, including one that would permit the allocation, on some basis, of value to the facility if part of a portfolio sale. Host Marriott failed to do this, but rather bound itself to a term that it later failed to observe, through no fault of Winchester.

While the result may seem harsh, the agreement on this point was clear in its terms; Host Marriott could structure a sale that would permit application of the formula it had agreed to use, or it could structure the sale in a way that prevented it from so doing. That it chose the latter did not render ambiguous an otherwise clear contract term. In either event, Host Marriott had complete control of the method of disposition, including a disposition that put it in breach of the agreement. We agree with Winchester that the breach here triggered the liquidated damages clause set out in section 9.1.1 of the agreement, requiring the payment of $1 million, as Host Marriott failed in its obligation to provide, within the time allotted, a calculation based on the "actual gross consideration" paid for the facility, to determine whether additional compensation was due. Winchester bargained for an automatic $1 million penalty in the event that Host Marriott breached the agreement, and a review of the record here

can lead to no conclusion other than that Host Marriott was in breach.[9] See *Bray* v. *Hickman*, 263 Mass. 409, 412 (1928) (contract "should be given a construction which will make it a rational business instrument and will effectuate what appears to have been the intention of the parties"); *Waldo Bros. Co.* v. *Platt Contracting Co.*, 305 Mass. 349, 355-356 (1940) (contract interpretation generally "yields to the purpose of the parties as disclosed by the words used and by the nature of the understanding disclosed by the instrument").

The trial judge was entitled to conclude, as he did, that the parties had not explicitly provided for a situation in which the facility was sold as one component in a multi-property sale, and that "if, as [Winchester] contends, the actual gross consideration refers to the entire portfolio in a portfolio sale, the spirit of the [agreement] would be violated, since this would overstate the true amount obtained by Host Marriott from the sale of the [facility] and would require it to pay all or some of the Contingent Purchase Price even if the IRR, by any fair measure, were less than 13.5%." He was not, however, free to substitute "allocated net fair value consideration," as there was no ambiguity in the term "actual gross consideration." This is not a case where the parties had "not agreed with respect to a term which is essential to a determination of their rights and duties." *President & Fellows of Harvard College* v. *PECO Energy Co.*, 57 Mass. App. Ct. 888, 896 (2003), quoting from Restatement (Second) of Contracts § 204 (1979). Nothing in the evidence suggests that omission of the circumstance of a portfolio sale was a mistake. Rather, Winchester bargained for additional compensation based on the "actual gross consideration" received by Host Marriott when it disposed of the facility.

Nor can Host Marriott argue that the sale of the facility as part of a portfolio essentially made it impossible or impracticable for it to comply with the language requiring it to use the "actual gross consideration" of section 1.2.3.3 because of its

---

[9]Host Marriott argues section 9.1.1 applies only if it breached its obligation to complete its purchase of the facility from Winchester. We decline to give section 9.1.1 so narrow a reading. Section 9.1.1 contemplates liquidated damages for a "default in any other manner under this agreement," and provides that "the amount of the deposit represents their reasonable estimate of such damages."

"ambiguity" and seemingly harsh result. Impossibility requires that the contract be based upon an assumption that is essential to the contract but fails to exist at the time performance is due. See *Baetjer* v. *New England Alcohol Co.*, 319 Mass. 592, 599 (1946). Here, the assumption was that the "actual gross consideration" would be calculable after the sale of the facility. The occurrence that created the supposed impossibility was the inclusion of the facility in a portfolio sale, without explicit reference to the price values of each of the thirty-one properties in the portfolio. Host Marriott, and the trial judge, support the substitution of the term "allocated net fair value consideration" for the term "actual gross consideration" in the agreement. This interpretation allows Host Marriott impermissibly to avoid a contractual obligation after it has structured the transaction in such a way as to create the impossibility. Once one party has made itself responsible for the disposition of the subject matter of a contract, it cannot claim later that the occurrence in question was not in the contemplation of the parties at the time of the contract. See *John Soley & Sons, Inc.* v. *Jones*, 208 Mass. 561, 567-568 (1911). To put it more simply, "[o]ne who prevents the performance of a contract cannot take advantage of its nonperformance." *Frank Fitzgerald, Inc.* v. *Pacella Bros., Inc.*, 2 Mass. App. Ct. 240, 242 (1974). See *Lobosco* v. *Donovan*, 30 Mass. App. Ct. 53, 56 (1991) ("it is fundamental that a promisor may not avoid his promised performance based on the nonoccurrence of a condition, where the promisor has himself hindered or prevented its occurrence").[10]

Host Marriott chose the portfolio method of sale, and then failed to comply with the provision of the agreement requiring the use of the actual gross consideration after the disposition of the facility. Any number of methods of structuring the disposition could have been carried out to permit compliance with the

---

[10]Impossibility preventing and excusing performance must lie beyond the control of the excused party. Here the defendants made a controlled decision to resell the facility as a part of a transaction preventing application of the contractual formula. That deliberate choice does not satisfy the rigorous standard of excusal by reason of impossibility or "supervening impracticability." Restatement (Second) of Contracts § 261 comment d (1981). See 30 Williston, Contracts § 77:1 (4th ed. 2004); 14 Corbin, Contracts § 74.5 (rev. ed. 2001).

terms of the agreement, but Host Marriot chose to structure its transaction in a manner that would not permit compliance with the "actual gross consideration" term. Host Marriott cannot argue that the term is harsh or ambiguous when it created the circumstances that it now argues caused the harshness or ambiguity.

As we conclude that Host Marriott was in breach of the agreement, and that the breach triggered application of the liquidated damage clause, we need not consider the issue of the fairness of the allocation method used by the trial judge.

4. *Breach of implied covenant of good faith and fair dealing.* Winchester argues that Host Marriott breached the implied covenant of good faith and fair dealing when it disposed of the facility in an undifferentiated portfolio sale. "[I]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." *Druker* v. *Roland Wm. Jutras Assocs., Inc.,* 370 Mass. 383, 385 (1976), quoting from *Uproar Co.* v. *National Bdcst. Co.,* 81 F.2d 373, 377 (1st Cir.), cert. denied, 298 U.S. 670 (1936). This covenant "exists so that the objectives of the contract may be realized . . . . The scope of the covenant is only as broad as the contract that governs the particular relationship." *York* v. *Zurich Scudder Invs., Inc.,* 66 Mass. App. Ct. 610, 615 n.2 (2006), quoting from *Ayash* v. *Dana-Farber Cancer Inst.,* 443 Mass. 367, 385, cert. denied sub nom. *Globe Newspaper Co.* v. *Ayash,* 546 U.S. 927 (2005). "This implied covenant may not be 'invoked to create rights and duties not otherwise provided for in the existing contractual relationship.' " *Ibid.*

We have carefully reviewed the record for evidence of bad faith and unfair dealings, and we are satisfied that on a review of the record, proof of bad faith at trial was lacking, and there was no error in the trial judge's determination on this count.[11] See *Equipment & Sys. for Indus., Inc.* v. *Northmeadows Constr.*

---

[11]Winchester notes that in her decision on the motion to dismiss, the motion judge raised the possibility that Host Marriott could be found to have breached the implied covenant of good faith and fair dealing even if its conduct did not

*Co.*, 59 Mass. App. Ct. 931, 932 (2003) (breach of contract alone does not support "an inference of a breach of an implied contract of good faith and fair dealing, implicating a dishonest purpose, consciousness of wrong, or ill will in the nature of fraud").

5. *G. L. c. 93A remedies.* For the same reasons that we affirm the dismissal of the claim for breach of the implied covenant of good faith and fair dealing, we also affirm the dismissal of the G. L. c. 93A claim.

6. *Conclusion.* In light of our conclusion that the defendants breached the provision of the agreement requiring them to compute whether any additional compensation was due Winchester using the "actual gross consideration" language, we reverse the judgment. A judgment shall enter awarding Winchester $1 million in liquidated damages, plus appropriate interest.

*So ordered.*

APPENDIX.

1.2.3. After Closing, Purchaser shall pay to Seller the Contingent Purchase Price, if any, determined as follows:

1.2.3.1. Effective as of the last day ("First Calculation Date") of the interim 4-week fiscal period of Purchaser in which falls the fifth (5th) anniversary of Closing, Purchaser shall calculate its internal rate of return ("IRR") on a pre-tax, unleveraged basis in accordance with *Exhibit* L, based upon (i) Purchaser's actual total investment in the acquisition and ownership of the Property, including the Minimum Purchase Price, costs associated with acquiring the Property, and additional capital expenditures (the "Total Investment"), (ii) the actual revenues and expenses in connection with the Property (net of any corporate overhead expenses) over the five (5) year period following Closing, calculated on an accrual basis and determined in accordance with GAAP (specifically excluding depreciation, other noncash charges and principal amortization and specifically including capital expenditures), and (iii) a hypothetical sale of the Property as of the First Calculation Date at a gross purchase price equal to the annualized Net Cash Flow for the thirteen (13) interim 4-week fiscal periods of Purchaser immediately preceding the First Calculation Date, capitalized at a rate of ten percent (10%) less assumed customary costs of sale of two percent (2%) (said calculation being the "First

violate the terms of the agreement. The cases that support this theory of liability have generally involved bad faith and malicious conduct. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471-473 (1991); *Cherick Distribs., Inc.* v. *Polar Corp.*, 41 Mass. App. Ct. 125, 127 (1996). After hearing all the evidence, the trial judge was in a far superior position to determine whether Winchester had established bad faith conduct by Host Marriott.

Calculation"). If Purchaser's IRR calculated in accordance with this Section 1.2.3.1 shall exceed thirteen and one-half percent (13.5%), then Purchaser shall pay to Seller, as Contingent Purchase Price, an amount (but in no event greater than $500,000.00) equal to the excess Net Cash Flow above that which would have been produced at an IRR of thirteen and one-half percent (13.5%). On or before the date which is sixty (60) days following the First Calculation Date, Purchaser shall submit to Seller the First Calculation, with such supporting materials as Seller may reasonably require, and shall pay to Seller any Contingent Purchase Price.

1.2.3.2. Effective as of the last day ("Second Calculation Date") of the interim 4-week fiscal period of Purchaser in which falls the tenth (10th) anniversary of Closing, Purchaser shall calculate its IRR on a pre-tax, unleveraged basis in accordance with *Exhibit* L, based upon (i) Purchaser's Total Investment (including any Contingent Purchase Price paid pursuant to Section 1.2.3.1), (ii) the actual revenues and expenses in connection with the Property (net of any corporate overhead expenses) over the ten (10) year period following Closing calculated on an accrual basis and determined in accordance with GAAP (specifically excluding depreciation, other noncash charges and principal amortization and specifically including capital expenditures), and (iii) a hypothetical sale of the Property as of the Second Calculation Date at a gross purchase price equal to the annualized Net Cash Flow for the thirteen (13) interim 4-week fiscal periods of Purchaser immediately preceding the Second Calculation Date capitalized at a rate of ten percent (10%) less assumed customary costs of sale of two percent (2%) (said calculation being the "Second Calculation"). If Purchaser's IRR calculated in accordance with this Section 1.2.3.2 shall exceed thirteen and one-half percent (13.5%), then Purchaser shall pay to Seller, as Contingent Purchase Price, an amount (but in no event greater than $500,000.00) equal to the excess Net Cash Flow above that which would have been produced at an IRR of thirteen and one-half percent (13.5%). On or before the date which is sixty (60) days following the Second Calculation Date, Purchaser shall submit to Seller the Second Calculation, with such supporting materials as Seller may reasonably require, and shall pay to Seller any Contingent Purchase Price. If Purchaser's IRR calculated in accordance with this Section 1.2.3.2 is less than thirteen and one-half percent (13.5%), Seller shall not be required to return any Contingent Purchase Price previously paid to Seller pursuant to Section 1.2.3.1.

1.2.3.3. Notwithstanding any other provision of this Section 1.2.3, if all or substantially all of the Property is sold, exchanged, transferred or otherwise disposed of, or all or substantially all of the ownership interests in Purchaser are sold, exchanged, transferred or otherwise disposed of, other than to an Affiliate of Purchaser (in which event Purchaser and its Affiliate shall continue to be obligated to pay the Contingent Purchase Price pursuant to Sections 1.2.3.1 and 1.2.3.2), prior to the First Calculation Date or the Second Calculation Date, then effective as of the date of such sale, exchange, transfer or disposition ("Disposition Date"), Purchaser shall calculate its IRR in accordance with Section 1.2.3.1 (if the Disposition Date is on or before the First Calculation Date) or Section 1.2.3.2 (if the Disposition Date is after the First Calculation Date but on or before the Second Calculation Date), except that the actual gross consideration of the Disposition, less the actual costs of the Disposition, shall be used in lieu of the hypothetical sale referenced in clause

(iii) of Sections 1.2.3.1 and 1.2.3.2 (said calculation being the "Disposition Calculation"). If Purchaser's IRR calculated in accordance with this Section 1.2.3.3 shall exceed thirteen and one-half percent (13.5%), then Purchaser shall pay to Seller, as Contingent Purchase Price, an amount (but in no event greater than $1,000,000.00 if the Disposition Date is on or before the First Calculation Date, and in no event greater than $500,000.00 if the Disposition Date is after the First Calculation Date but on or before the Second Calculation Date) equal to the excess Net Cash Flow above that which would have been produced at an IRR of thirteen and one-half percent (13.5%). On or before the date which is sixty (60) days following the Disposition Date, Purchaser shall submit to Seller the Disposition Calculation, with such supporting materials as Seller may reasonably require, and shall pay to Seller any Contingent Purchase Price. Upon payment by Purchaser of the Contingent Purchase Price, if any, determined pursuant to this Section 1.2.3.3, Purchaser shall have no further obligations to pay any additional Contingent Purchase Price pursuant to either Section 1.2.3.1 or 1.2.3.2.