# United States Court of Appeals
## For the First Circuit

No. 11-1628

AMICAS, INC.,

Plaintiff, Appellee,

v.

GMG HEALTH SYSTEMS, LTD., d/b/a Gonzaba Medical Group,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. Magistrate Judge]

Before
Torruella, Circuit Judge,
Souter,[*] Associate Justice,
and Boudin, Circuit Judge.

James L. Messenger with whom Kevin G. Kenneally and
LeClairRyan, P.C. were on brief for appellant.
Lawrence S. Delaney with whom Joseph M. Downes III and Demeo
& Associates, P.C. were on brief for appellee.

April 10, 2012

[*]The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**BOUDIN**, <u>Circuit Judge</u>.  This appeal concerns a contract dispute between two companies: Gonzaba Medical Group ("GMG"), a 280-employee provider of medical services, and Amicas, Inc. ("Amicas"), a publicly-traded information technology ("IT") company specializing in medical software.  GMG contracted with Amicas in 2006 to develop and license two computer programs related to GMG's radiology services: a picture archiving communications system ("PACS") and radiology information system ("RIS").

Broadly speaking, the purpose of the software was to automate the collection and transfer of information necessary for billing that GMG had previously been entering manually.  The aim was to avoid revenue loss due to incomplete capturing of billable charges that had occurred through manual data entry.  To this end, the proposed software had to accept information from a patient management system previously established by another company-- Sage--and send information to Sage's previously established billing system.

The parties reached an agreement in October 2006 and executed a contract, drawn up by Amicas, calling for GMG's payment of $1,009,548 over five years in exchange for a software license for the RIS and PACS programs, specified hardware, and continuing support services from Amicas.  The agreement (whose relevant provisions are set out in an appendix to this opinion) comprised a

set of different documents signed on the same date, and contained an integration clause.

The agreement warranted that for 90 days after the "go-live date" the software would "substantially conform to Documentation"--specified product manuals for the relevant software and hardware--"when used by [GMG] in a manner that is consistent with the Documentation." But the warranty excluded any failure resulting from databases of GMG or third parties and warned that "[Amicas] does not warrant that the Software described herein will meet [GMG's] requirements."

Amicas developed and installed the programs, which involved working with Sage to design, test, and tweak the "interfaces"--the programming necessary to move data from the Sage patient management system into the Amicas RIS system and out to Sage's billing system. It was controversy over the operation of the latter connection, referred to by the parties as the "chargeout interface," that ultimately led to this litigation.

GMG began using Amicas' software and hardware on March 13, 2007 (the "go-live date"), but the chargeout interface was not ready due to GMG's indecision on a particular implementation detail and delays on Sage's end of the interface, so GMG continued processing radiology charges manually in the interim. GMG started using the chargeout interface in late July, and reported several

problems to Amicas in the first few months--one a minor glitch that was easily resolved.

More serious were transpositions of the name of the physician who read the radiology films and the referring physician; Amicas investigated the name switching issue and reported that the problem stemmed from how Sage's software was processing and interpreting Amicas' batch file, not with what Amicas' program was producing.  After some internal deliberations and more back and forth with Amicas over a few weeks, GMG referred the issue to Sage.

The record does not reveal whether Sage resolved the problem but it is clear that GMG continued to experience some frustration with the system, and it ultimately stopped using the chargeout interface altogether in "late 2007," opting instead for its old method of manual processing.  However, GMG does not claim that it informed Amicas of that decision--or even that any problems whatsoever with the chargeout interface persisted.

By November 2007, GMG was negotiating with Sage to develop substitute software, and by February 2008 Sage was proposing to demonstrate a replacement product.  An e-mail from Sage to GMG in March 2008 urged that "[o]ur experts feel that almost 100 percent of [your errors] are due to . . . having disparate systems and would be eliminated by using our RIS system."

As the negotiations with Sage progressed, GMG's principal contact with Amicas, Elsa Vasquez,[1] e-mailed Adam Helms (the Amicas engineer responsible for setting up the chargeout interface) on February 8, 2008--some five months after Vasquez's last communication with Amicas about the chargeout interface--to ask "where we are with this interface." Helms, who was under the impression it was successfully installed months earlier, expressed surprise at the question and asked Vasquez for clarification.

Over the next few months, GMG reported problems it perceived with the interface, and Amicas worked with Sage to follow-up on GMG's concerns. Helms ultimately concluded that the problems were attributable to "GMG's failure to maintain consistent sets of data," and were worsened by user errors and failure to report the issues earlier. Amicas finished its work on the reported issues by May 2008, but in June 2008--around the same time that negotiations with Sage for replacement software neared completion--GMG put off all efforts to test the chargeout interface.

On June 30, 2008 (10 days after Sage forwarded GMG a contract for replacement software), GMG sent Amicas a termination notice, citing "fail[ure] to conform to the Documentation and

---

[1]Vasquez--the full-time GMG employee with the "responsibility to ensure that the software and hardware solution[s] for the GMG practice function[ed] effectively"--held the title of "Imaging Services Coordinator/Radiology Manager." She had no IT background or training.

[failure to] deliver[] a functional product." Amicas and GMG personnel met on July 9, 2008, to discuss GMG's letter, but by then GMG had decided to substitute Sage and had directed Sage not to cooperate further with Amicas on seeking solutions to whatever interface problems remained. Amicas then brought the present suit against GMG in federal district court.

Amicas' complaint alleged breach of contract, together with other claims not at issue on appeal, and GMG counterclaimed (e.g., for breach, negligent misrepresentation, and violation of Chapter 93A, Mass. Gen. Laws ch. 93A, § 11 (2011)). Following discovery, both parties moved for summary judgment; the district court found for Amicas on its breach claim, rejected GMG's counterclaims, and ordered the parties to bring any remaining issues to the court's attention within 20 days.[2]

Amicas had sought $778,889 in damages (plus costs and fees) in the complaint and in its motion for summary judgment, and GMG proceeded to contest the $778,889 figure. The court then ordered further briefing on attorneys' fees, costs, and prejudgment interest, which GMG used in part to renew its attacks on the damages request. The court agreed with Amicas that the requested $778,889 damages had already been established as part of the summary judgment ruling, but treated GMG's arguments as a Rule

---

[2]Both parties consented to proceed before a magistrate judge, 28 U.S.C. § 636(c); Fed. R. Civ. P. 73, who for purposes of this decision we describe simply as the court.

-6-

60(b) motion for reconsideration and ordered Amicas to respond on the merits.

After Amicas responded, the court denied Rule 60(b) relief, adding that "[i]n any event, GMG's arguments [were] without merit" because GMG's interpretation of the contract was incorrect. The court reaffirmed its award of $778,889 in damages and added $324,805 in attorneys' fees (and uncontested amounts in costs and prejudgment interest). On GMG's appeal, our review is de novo, drawing inferences in the light most favorable to the nonmoving party. Kuperman v. Wrenn, 645 F.3d 69, 73 (1st Cir. 2011).

GMG contests both its liability and the awards of damages and attorneys' fees, and we start with the issue of liability. GMG's position, in a nutshell, is that Amicas never established that it had itself performed its obligations under the contract and that, assuming in the alternative that Amicas made out even an arguable showing that it had done so, the question posed factual questions requiring a full jury trial.

In principle, a party suing for breach of contract under Massachusetts law--which governs the contract in the case--must establish (1) the existence of the contract, (2) the plaintiff's willingness to perform or performance, and (3) breach by the defendant; if damages are sought causation and the amount of damages must also be proved. E.g., Singarella v. City of Boston, 173 N.E.2d 290, 291 (Mass. 1961). With respect to the second

-7-

element, Amicas says that the defendant bears the burden of showing the plaintiff's non-performance as a defense.[3]

As a practical matter, it is usually easy for a plaintiff to assert, and offer a competent witness to say, that it performed its obligations or stood ready to perform them; and, to create an issue, in practice the defendant has to identify the respect or respects in which it claims that the plaintiff's performance fell short. We will assume for present purposes that if a material issue of fact were posed by the evidence as to the plaintiff's performance, the burden of proof at trial would be the plaintiff's.

The burden of proof issue does not matter here because at the summary judgment stage Amicas did tender adequate proof that it had performed and GMG--although claiming a specific alleged flaw in Amicas' performance--failed to offer any competing competent evidence to counter that of Amicas, and so failed to generate a material issue preventing summary judgment. We start with Amicas' showing of what (with all the risks of using a much misunderstood phrase of many shadings) we will call a "prima facie" case--meaning here only that it was enough to prevail on summary judgment unless seriously countered with admissible evidence.

---

[3]Although Amicas cites several First Circuit cases that omit the second element in describing the essentials of a contract claim, see Michelson v. Digital Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999); Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995), it should be borne in mind that often performance by the plaintiff is undisputed.

-8-

Here, Amicas amply satisfied the burden of showing that it had performed its end of the bargain through the affidavit of its implementation engineer (Helms), who stated that the "[c]hargeout interface[] worked as planned," that Amicas resolved all of the perceived problems reported by GMG, and that those issues were not errors caused by Amicas' system. There was no dispute that GMG did not carry out its obligations, for it had cancelled the contract--although it was free to argue that it had cause for doing so.

GMG could have countered by creating a factual issue as to whether Amicas had fulfilled its obligations. It might have offered a competent affiant to say that Amicas' program had not met significant technical specifications of the contract for the software or hardware, or that in some other respect Amicas had not met specific obligations under the contract. If such a proffer of admissible evidence had been made, it could have foreclosed summary judgment and created a material issue of fact to be sorted through by a factfinder at trial.

Instead, GMG relied primarily on Elsa Vasquez's deposition testimony and affidavits asserting in general terms that Amicas "fail[ed] to implement a functional chargeout interface" and failed to solve problems with the interface identified by GMG. As the district court pointed out, Vasquez had no IT training or background, never read the specifications for the software, was

unfamiliar with basic, key concepts underlying its operation and could not elaborate on her statements or identify any specific failure of the chargeout interface.

Conclusory allegations regarding technical issues offered by a witness demonstrably lacking technical background and understanding do not create a jury issue.[4] GMG points to a May 20, 2007, internal e-mail from Amicas sales representative Kurt Hammond stating in part: "The Charge Out interface is not functioning, never has, so from the customer's perspective is not complete." But the context of the e-mail--correspondence in which Amicas personnel discussed whether any work related to GMG was outstanding--makes clear that Hammond was simply relaying the substance of GMG's position, not agreeing with it.

GMG says that Helms' evidence is insufficient because "the Documentation"--the specified product manuals for the relevant software and hardware--was never itself entered into evidence. But GMG was free in the district court to seek any information about specifications it did not have; and even now it does not make a specific and colorable claim that the contents of the documentation show that Amicas failed to provide conforming software or hardware. GMG was entitled to fish for flaws in Amicas' promised performance, but it makes no showing that it found any.

---

[4]See DeNovellis v. Shalala, 124 F.3d 298, 305-06 (1st Cir. 1997); see also Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc., 249 F.3d 1341, 1353 (Fed. Cir. 2001).

Turning to a legal argument, GMG argues that regardless of who was responsible for the problems with the chargeout interface, Amicas breached a separate promise--made during precontract negotiations--to deliver a product that "seamlessly" interfaced with Sage. However, the agreement contains an integration clause declaring that the writing supersedes any prior agreements, so the parol evidence rule renders any earlier-stage agreement unenforceable. E.g., Winchester Gables, Inc. v. Host Marriott Corp., 875 N.E.2d 527, 533 (Mass. App. Ct. 2007).

GMG says that the integration clause is unenforceable because it was in a pre-printed form that was signed without negotiation of its terms by GMG, and GMG was not represented by counsel in the negotiations. GMG--a company with 280 employees, multiple offices, and annual revenues in excess of $20 million--is hardly an ill-equipped or outmatched party, and the integration clause binds it as much as it does Amicas. E.g., USM Corp. v. Arthur D. Little Sys., Inc., 546 N.E.2d 888, 894 (Mass. App. Ct. 1989).

GMG then says that prior discussion of seamless operation is relevant to interpretation of ambiguities in the agreement. But far from being ambiguous, the contract provisions earlier quoted make it explicit that Amicas merely promised to deliver materials that conform to specifications, and that "[Amicas] does not warrant that the Software described herein will meet [GMG's] requirements."

-11-

Against this explicit language, to insist on seamless performance would not be to explain ambiguity but to contradict the agreement.

This brings us to GMG's attack on the award of damages. The lower court treated its own summary judgment decision as having resolved the issue of damages, relegating GMG to a Rule 60(b) motion; while the court denied the latter as a Rule 60(b) motion--a denial ordinarily reviewed only for abuse of discretion--the court said that GMG's objections to the award also failed on the merits. Amicas argues that GMG essentially forfeited any damages arguments, but that somewhat overstates the case.

It is true that the payment terms were in the agreement before the district court and that Amicas explained in its summary judgment papers that it was seeking $778,889 plus interest, costs, expenses and attorneys' fees (as provided by the agreement in the event of a breach). Amicas included a table showing the fee amounts for each year of the contract's five-year term. In opposition, GMG offered only two opaque statements in its response to Amicas' statements of material facts and said nothing in its memorandum.[5]

---

[5]The statements were:

-[T]he basis for specific GMG payments is not shown or explained or itemized by Amicas as between license fees, equipment purchases, extra study charges, or reimbursements for Amicas meals and travel. If Amicas contends that all of the $230,659 is payments to be applied solely to the non-specified five year "schedule," that is disputed because it is not shown.

-12-

Yet the lower court did not mention damages in its summary judgement decision, an issue often reserved for further proceedings, and in its Rule 60(b) ruling it addressed the new arguments on the merits. We choose to treat GMG as having preserved for ordinary--here de novo--review both its sketchy damages objections made in opposing summary judgment and the somewhat more developed version offered in its Rule 60(b) motion. But GMG's real problem is that even now it fails to attack the damage award on its potentially vulnerable points.

The agreement as originally drafted provided for a one-year term with presumptively renewing annual support service terms; but an addendum, included when the agreement was signed, converted this to a five-year term with a schedule for annual payments: these started at just under $200,000 for the first year rising to somewhat over $200,000 for the last. Amicas sought the sum of these payments ($1,009,548), less what had been paid ($230,659); and the net figure ($778,889) is what the district court awarded.

In response to this damage claim, GMG could have argued--at least in the alternative--that even if it breached the contract, it owed Amicas whatever had been promised but less performance costs that Amicas saved due to the early termination. GMG could

-[N]o competent evidence shows that GMG payments were solely to be applied against the $1,009,548 total. "Contract price" is not defined not even in the Amicas boilerplate. The boilerplate does not explain the yearly numbers."

also have argued that future payments should be discounted to present value. It has made neither argument. Instead, GMG has argued throughout and exclusively that it owes only about $23,000 constituting the unpaid balance of the payments scheduled as due as of the date of termination, which was about sixteen months into the five-year period.

The basis for this contention is a section of the agreement providing that

> [u]pon termination [for any reason other than a material breach by Amicas] . . . [GMG] will pay AMICAS for all services performed by AMICAS up to the date of such termination and all other amounts [GMG] owed to AMICAS as of the date of such termination including, but not limited to, the unpaid portion of the Software Support Fee for the balance of the Term or Renewal Term.

According to GMG, this language together with the addendum's schedule of payments shows that the stream of payments comprised a continuing use fee; and it argues that termination, curtailing use, also eliminated responsibility for any amount not already due under the schedule "as of the date of such termination."

But there are serious problems with this reading both on a technical level and because of the logic of the original structure and the addendum. On a technical level, payment of "services performed" could be read to cover the development of the software and purchase of associated hardware--all of which were accomplished at the very outset. Indeed, under the pre-addendum

-14-

payment schedule, payment of these items--as distinct from continuing support costs--had to be made within 60 days after delivery of the new system.

And, although the addendum spread out all of the costs over a five-year period, all five years' worth of payments necessarily included very substantial costs for software development and purchased hardware incurred by Amicas at the very outset--effectively sunk costs. No evidence to which we are pointed identifies just how much of each payment was for costs incurred at the outset and how much was for continuing support; but a horseback estimate offered by one lawyer at argument suggested that the continuing support was the lesser portion of the payments.

The term extension and payment schedule make sense as a financing device to stretch out the payments instead of requiring immediate payment within 60 days of Amicas' software development and hardware costs. But the termination clause, if read as GMG urges, would allow GMG to cancel the agreement early in the five-year period, despite delivery of a compliant system by Amicas, and thereby shift from GMG to Amicas the entire burden of sunk costs not yet recovered by Amicas. Judged by the test of common sense,[6]

---

[6]Liberty Mut. Ins. Co. v. Nippon Sanso K.K., 331 F.3d 153, 159 (1st Cir. 2003) (common sense reading of contractual provisions); Rhode Island Charities Trust v. Engelhard Corp., 267 F.3d 3, 7 (1st Cir. 2001) (same).

this hardly looks like a burden that Amicas would have been willing to assume.

The reading would also render meaningless for practical purposes the warranty provisions already quoted; these make clear that, so long as Amicas delivered a system conforming to the specifications, the risk of dissatisfaction was borne by GMG. Courts do not favor a reading that undermines explicit provisions elsewhere in a contract. E.g., J.A. Sullivan Corp. v. Commonwealth, 494 N.E.2d 374, 378 (Mass. 1986). Nor has GMG at any point proffered any extrinsic evidence suggesting that the parties aimed at the reading GMG has urged.

The parties here extended the term and payment schedule but then failed to adjust with any care the existing termination clause premised on a different term and payment schedule. In this situation, the practice is to impute to the parties a solution that best carries out the logic and purpose of their agreement. LPP Mortg., Ltd. v. Sugarman, 565 F.3d 28, 34 (1st Cir. 2009). On this basis, GMG could have sought to limit its liability to expectation damages--the promised stream of payments, less Amicas' avoided costs, with the net amount discounted to present value.[7]

GMG chose not to make such arguments either in the district court or to us. Plain error reversals are very rare in

---

[7]E.g., Monadnock Display Fireworks, Inc. v. Town of Andover, 445 N.E.2d 1053, 1056 (Mass. 1983); 3 Farnsworth, Farnsworth on Contracts § 12.9 (3d ed. 2004).

-16-

civil cases, <u>Tuli</u> v. <u>Brigham & Women's Hosp.</u>, 656 F.3d 33, 45-46 (1st Cir. 2011), and GMG has not even argued for one here. Nor, based on any evidence supplied by GMG, could we ourselves calculate a reduction based on avoidable costs. GMG's all-or-nothing argument was a gamble, possibly one based on deliberate calculation, but it has not paid off.

As for GMG's attack on the award of attorneys' fees, as provided in the agreement, it is undeveloped and in any event based on the proposition that it owes only about $23,000 based on its (flawed) reading of the termination clause. GMG's attempt to revive its dismissed counterclaims for negligent misrepresentation and violation of chapter 93A rest on Amicas' supposed promise of a seamless interchange with Sage, and have already been answered.

<u>Affirmed</u>.

APPENDIX

Excepts from Software License, Hardware, Services and Support

Agreement:

1.1. Agreement. . . . This Agreement and any exhibits, schedules and attachments attached hereto constitute the entire agreement between the parties and supersedes all prior or contemporaneous agreements, representations and proposals, written or oral, including the terms of any prior, contemporaneous, or subsequent [purchase orders] (except as set forth above) relating hereto, except for Customer's obligations to pay support or other fees under existing contract(s), if any, between the parties.

1.2. Definitions. . . . Documentation means the product manuals accompanying or associated with the Software and, if applicable, the Hardware delivered or available to Customer. However, Documentation (a) may describe (i) some functionality that is specified for configurations that Customer does not have and (ii) modules or products not included, and therefore are not applicable, (b) may contain certain sections that, from time to time, may be out of date in a manner that will not have a material effect on Customer or the value of the Software to Customer, and (c) may not be applicable as to each Update, however the Documentation will be updated by AMICAS for major Updates.

3.1. Fees and Payments. Customer will pay to AMICAS the fees, amounts and expenses due AMICAS as specified herein. Customer is obligated to pay the Software Support Fee for the entire Term. Customer acknowledges that in the event AMICAS allows the Customer to pay said fees on a periodic basis such arrangement is done as an accommodation to Customer only.

3.2. Failure to Pay or Comply. Failure to . . . . pay the license fees for the Software in accordance with this Agreement will result

-18-

in termination of Customer's Software license, termination of this Agreement and will obligate Customer to return any and all Software and Documentation to AMICAS.

3.3.  Payment Terms.  Payment terms are set forth in Schedule A.  All payments . . . must be paid within thirty (30) days of receipt of the invoice.

4.1.  Term.  This Agreement will commence on the Effective Date.  Support will commence the first day of the month after the Delivery Date and end on the first day of the calendar month containing the one year anniversary of the Delivery Date ("Term").

4.3.  Effect of Termination.  Upon termination for any reason, other than an AMICAS Breach (defined as a material breach by AMICAS as determined by final arbitration or a court of competent jurisdiction), Customer will pay AMICAS for all services performed by AMICAS up to the date of such termination and all other amounts Customer owed to AMICAS as of the date of such termination including, but not limited to, the unpaid portion of the Software Support fee for the balance of the Term or Renewal Term.

9.1.  Warranties.  Provided Customer complies with the terms of this Agreement, AMICAS warrants that, during the ninety-day period following the Go Live Date, the AMICAS Software will substantially conform to the Documentation when used by the Customer in a manner that is consistent with the Documentation.  AMICAS does not warrant that the Software described herein will meet Customer's requirements. . . . This software warranty will not apply and AMICAS will be neither obligated nor responsible to repair, replace, or grant a refund with respect to any AMICAS software that does not conform to its Documentation as a result, in whole or in part, of one or more of the events indicated in Section 12.4 (Limitations & Exclusions).

9.2.  Warranty Limitations.  OTHER THAN AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER AMICAS NOR ANY THIRD PARTY SOFTWARE OR HARDWARE PROVIDER MAKES ANY EXPRESS OR IMPLIED WARRANTIES TO CUSTOMER, WITH RESPECT TO THE SOFTWARE, THE DOCUMENTATION, THE HARDWARE, OR ANY SERVICES PROVIDED HEREUNDER OR OTHERWISE REGARDING THIS AGREEMENT.  WITHOUT LIMITING THE FOREGOING, ANY IMPLIED WARRANTY OF MERCHANTABILITY, INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY EXCLUDED AND DISCLAIMED.

12.4. Limitations & Exclusions. AMICAS will not be responsible for providing Software Support Service relating to the following: . . . (c) problems caused by Customer's data, network, operational or other environmental factors not within the direct control of AMICAS; (d) third party databases (except for any database that is suppled by AMICAS as part of the AMICAS Software); . . . .

Excerpts from Product List, Fees and Payment Terms: SCHEDULE A:

Payment Terms:  Customer shall pay AMICAS the applicable license, Hardware costs, Services and Support Fees in accordance with the following schedule: 1) For the AMICAS Office Solutions product (which includes certain AMICAS Software, services, and third party hardware): (a) 30% is due upon the Effective Date; (b) 40% is due thirty (30) days after the Delivery Date; and (c) 30% is due sixty (60) days after the Delivery Date. . . . 3) Support Fees[.]  Upon each annual anniversary of the Delivery Date, Customer shall pay the applicable annual Software and Hardware Support Fees.

Excerpts from General Addendum:

Modify the following License Fees payment terms section of Product List, Fees and Payment Terms: SCHEDULE A to add the following: . . . Customer shall pay AMICAS the applicable license, Hardware costs, Services and Support Fees in accordance with the

following schedule: 1) Notwithstanding anything in the Agreement to the contrary, for those products and services that are based on Per Captured Study pricing:

(a) All license fees, Support fees, hardware costs, training and professional services fees related to such products and services are part of the Per Captures Study fee which is based upon the number of Captured Studies all as set forth in Schedule A. No additional payments will be due from Customer for such products and services.

(b) Section 4.1 of the Agreement is amended so that the Term of the Agreement shall begin on the Effective Date and end Five (5) years after the Captured Study Start Date.

(c) The Per Captured Study fee set forth on Schedule A shall be paid as follows: Payments shall be made quarterly in arrears beginning on the Captured Study Start Date, and the Excess Study License Fee shall be determined and paid on a monthly basis in arrears. The Per Captured Study fee shall increase after the first year as shown on the Schedule A.

Excerpts from Schedule A to the General Addendum:

Captured Studies: . . . Excess Captured Study Fee $5.80 per Captured Study.

Year 1: 31,500 $182,700.00
Year 2: 33,075 $191,835.00
Year 3: 34,730 $201,434.00
Year 4: 36,465 $211,497.00
Year 5: 38,290 $222,082.00